IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW FORTSON, | ) | CASE NO. 1:15CV2078 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| LaSHAUNN EPPINGER, Warden | ) | JONATHAN D. GREENBERG |
| | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

This matter is before the undersigned pursuant to Local Rule 72.2. Before the Court is the Petition of Andrew Fortson ("Fortson" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. Fortson is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case *State v. Fortson*, Cuyahoga County Court of Common Pleas Case No. CR 385443. Also pending are Petitioner's (1) Motion to Expand the Record (Doc. No. 36), and (2) Motion for Evidentiary Hearing (Doc. No. 38.)

For the following reasons, the undersigned recommends that (1) Petitioner's Motion to Expand the Record be GRANTED IN PART and DENIED IN PART; (2) Petitioner's Motion for Evidentiary Hearing be DENIED; and (3) the Petition be DISMISSED as time-barred.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized the facts underlying Fortson's conviction as follows:

> The victim, Elaine Lovett (aka Little Bit), a prostitute working for defendant, was killed more than twenty years ago on June 1, 1978.  Two of defendant's relatives, Robbie Robertson (his half brother) and Charles Tolliver (his first cousin) were also allegedly involved.  Police in Euclid (where the killing occurred), New York (where the victim and her family were from), and Florida (where another prostitute moved to escape defendant) put together parts of the case over a period of more than twenty years.

> There was little physical evidence at the scene to indicate who committed the homicide.  Fingerprints were found on two glasses in the victim's kitchen but were not identified until 1999.  The investigation went through several stages: in 1978 when the homicide occurred, in 1986 when an alibi witness recanted her testimony, in 1991 when defendant's daughter told the police defendant admitted to the killing, and finally in 1999 when the police linked the fingerprints to defendant's co-defendant Robertson and Charles Tolliver.

> On June 1, 1978, defendant and prostitute Jackie Lynn (aka Jackie Colter) reported finding the victim's body in her Euclid residence and were questioned by police. Lynn/Colter apparently did not know what happened.  She was hysterical and police took no statement from her.

> Two weeks later, on June 16, 1978, defendant and prostitute Jacque Conners (aka Tina Heimer) were questioned.  Conners/Heimer provided defendant with an alibi for the time of the killing.  Approximately eight years later, on May 3, 1986, after she had fled to Florida to escape defendant, however, she talked to Euclid police and recanted the alibi.  The witness stated she told defendant on May 28, 1978 that the victim was going back to New York, would prostitute for someone else, and had given her new pimp some diamonds that defendant had given her. Defendant told the witness "I'm going to kill the bitch."  On the evening of the murder, Conners/Heimer fell asleep with defendant, and awoke between 3:00 and 4:00 a.m. when he was gone.  When defendant returned after 4:00 a .m., he was nervous, pacing and looking for a "witness."  She agreed to provide him an alibi.

2

When defendant tried to kill her with heroin in September of 1978, she fled to Florida.

Brenda Caver, another prostitute (and defendant's common law wife) had a daughter with defendant by the name of Andee Caver.  Both Brenda and Andee testified that defendant was a pimp, that they were afraid to testify, and that he urged them to go to California rather than testify.  The court called defendant's daughter as its own witness and each party cross-examined her.  Her testimony at trial was guarded and vague.  She admitted that she told Euclid police in 1991 that defendant confessed to killing the victim known as Little Bit.

The victim's mother and sister testified that the victim was in New York shortly before she was killed.  The victim told her mother, Damilian Hildago, that she was afraid of "Andy" (defendant Andrew Fortson/Tolliver).  The victim told her sister, Helen Lovett, that she was going back to Cleveland to get her possessions despite the fact that "Andy told me if I go back, he will kill me."

The victim was strangled by her telephone cord and stabbed sixteen times in the apartment defendant rented for her shortly after she returned to Cleveland.  Her furniture was also repeatedly slashed.  There were no signs of forced entry.

After identifying his fingerprints on one of the glasses from the victim's apartment, Euclid and New York City police detectives interviewed co-defendant Robbie Robertson in 1999.  NYPD Detective Neglia and Euclid Detective Jorz testified that Robertson told each of them the same story.  When asked whether defendant was the killer, Robertson answered "you're barking up the wrong tree. You have to question the guy who drove me there."  Jorz testified that the fingerprints on the drinking glasses found in the victim's apartment belonged to Robertson and Tolliver, defendant's relatives.

The matter proceeded to a joint trial against defendant and co-defendant Robertson on charges of aggravated murder and conspiracy to commit aggravated murder. [footnote omitted].  The jury found defendant guilty of aggravated murder and acquitted Robertson. Defendant appeals, raising eleven assignments of error.

*State v. Fortson*, 2001 WL 898428 at * 1-2 (Ohio App. 8th Dist. Aug. 2, 2001).

## II. Procedural History

**A.      Trial Court Proceedings**

In December 1999, a Cuyahoga County Grand Jury charged Fortson with one count of

3

aggravated murder in violation of Ohio Rev. Code § 2903.01 (Count One), and one count of conspiracy to commit aggravated murder in violation of §§ 2923.01/2903.01 (Count Two).  (Doc. No. 9-1, Exh. 1.)  This indictment was assigned Case No. CR 385443.  Fortson pled not guilty. (Doc. No. 9-1, Exh. 2.)

Subsequently, on April 11, 2000, the State re-indicted Fortson with respect to Count Two of the above case in order to specify certain overt conduct supporting the conspiracy charge.[1] (Doc. No. 9-1, Exh. 3.)  This indictment was assigned Case No. CR 389991.  On recommendation of the prosecutor, the trial court *nolled* Count Two in Case No. 385443.  (Doc. No. 9-1, Exh. 4.)  On May 3, 2000, Fortson was arraigned and pled not guilty.  (Doc. No. 9-1, Exh. 5; Doc. No. 29-1 at Tr. 13-15.)

The docket reflects Fortson filed a motion for separate trials and relief from prejudicial joinder.   Following oral argument pertaining to this issue, the trial court proceeded with the trial of both Fortson and his co-defendant Robbie Robertson.  (Doc. No. 29-1 at Tr. 6-8.)

Jury trial commenced on May 3, 2000.  On May 12, 2000, the jury found Fortson guilty of aggravated murder in violation of Ohio Rev. Code § 2903.01, as charged in Case No. 385443. (Doc. No. 9-1, Exh. 6.)  He was acquitted of conspiracy to commit aggravated murder in violation of §§ 2923.01/2903.01, as charged in Case No. CR 389991.

On May 29, 2000, Fortson filed a motion for judgment of acquittal and/or a new trial, raising ten grounds in support.  (Doc. No. 9-1, Exh. 8.)  Via Journal Entry dated June 6, 2000, the

---

[1] As the state appellate court later explained: "The State apparently sought the second indictment on the conspiracy to commit aggravated murder charge so that the indictment would be in compliance with the then-recent Supreme Court of Ohio case of *State v. Childs* (2000), 88 Ohio St.3d 194, 2000-Ohio-298, which requires that overt acts of conspiracy must be specified in the indictment." (Doc. No. 9-5, Exh. 75.)

4

trial court summarily denied Fortson's motion.  (Doc. No. 9-1, Exh. 9.)

The trial court conducted a sentencing hearing on June 6, 2000, at which time Fortson was sentenced to a term of life imprisonment with parole eligibility after twenty (20) years. (Doc. No. 9-1, Exh. 10.)

**B.     Direct Appeal**

On July 5, 2000, Fortson, through the same counsel, filed a Notice of Appeal with the Court of Appeals for the Eighth Appellate District ("state appellate court").  (Doc. No. 9-1, Exh. 11.)  In his appellate brief, Fortson raised the following eleven assignments of error:

I.      The Court erred and the defendant was denied a fair trial when the Court denied defendant's "Motion for a Separate Trial and Relief From Prejudicial Joinder" and the defendant's motion for a mistrial.

II.     The defendant's right of confrontation and the hearsay rule were violated when the court allowed the jury to consider a plethora of hearsay evidence.

III.    The admission of the written statements (including comments) made by the co-defendant (who must be viewed as a non-testifying 'declarant, as that term is defined in Rule 801(b), Ohio Rules of Evidence) as substantive proof of the defendant's guilt violated the hearsay rule.

IV.     The admission as substantive proof of statements made by the co-defendant violated the defendant's right of confrontation.

V.      The Court erred when it failed to require the State to produce copies of all statements, interview notes, summaries and the like that included any comments made by, or attributed therein to, various witnesses, including Jackie Colter (or any other name used by her at the time) in her various interviews.

VI.     The Court erred and defendant's right of confrontation was violated when the Court refused to allow the defense to cross-examine a witness as to certain omissions from the witness' written statement.

VII.    The State was guilty of misconduct and the accused denied due process in the wake of the Court's validating the State's objections to the

5

defense making full use of the witness Heimer's statement to the police.

VIII. Due process was denied the Defendant when counsel for the State asked a series of leading questions directed at the defendant's daughter, which questions had the effect of either supplying her with a 'false memory' of what she had told the police, or worse yet, were asked without a factual foundation and thus insinuated the defendant actually had caused not only the decedent's, but another person's as well.

IX. Counsel for the State was guilty of misconduct when he argued, without a factual basis, that the defendant had in fact told his daughter he killed the decedent and that defense counsel's argument in response thereto was flawed.

X. The prosecutor was guilty of misconduct in the wake of his gross insinuations and suggestions that the defendant's daughter had been threatened and that these threats accounted for her asserted reluctance to testify against the defendant and arguably accounted for the witness' testimony having been weak and inconsistent.

XI. Given that it is unprofessional for a prosecutor to intentionally refer to, or argue on the basis of facts outside the Record, to insinuate the existence of facts for which no proof was offered, and to denigrate the legitimate efforts of counsel or personally attack his ethics and integrity, it follows the prosecutor's actions assailed herein must be regarded as misconduct sufficient enough to deprive the accused of a fair trial.

(Doc. No. 9-1, Exh. 12.) The State filed a brief in response. (Doc. No. 9-1, Exh. 13.)

On August 2, 2001, the state appellate court affirmed Fortson's conviction and sentence.

(Doc. No. 9-1, Exh. 15.) *See also State v. Fortson*, 2001 WL 898428 at * 1-2 (Ohio App. 8th

Dist. Aug. 2, 2001).

On September 21, 2001, Fortson, through the same counsel, filed a Notice of Appeal with

the Supreme Court of Ohio. (Doc. No. 9-1, Exh. 16.) In his Memorandum in Support of

Jurisdiction, Fortson raised the following nine Propositions of Law:

I. Where it was evident the State intended to use statements made by an alleged co-defendant (while he was in custody) as substantive proof of guilt, which statements implicated the appellant in the charged crime

6

and also accused him of other crimes, due process and the right of confrontation barred such use.

II.      Due Process and the Right of Confrontation are violated when, despite categorical testimony by a police officer (speaking on the basis of first hand knowledge) that arguably producible witness statements existed, the Court on the basis of the Prosecutor's naked assurances no such statements existed refused to require the State to produce those statements, and also failed to conduct any type of inquiry.

III.      A reviewing Court fails to accord due process to one appealing their conviction when it not only ignores indisputable facts, but literally creates, out of whole cloth, asserted facts to justify certain flawed conclusory assertions which were urged as being dispositive of critical issues.

IV.      When a witness, upon being asked by the prosecutor, denies the accused made to her certain inculpatory statements, including the admission that he committed the homicide centralized in the prosecution (then on trial), the accusations made or insinuated in these questions must be regarded as 'hearsay."

V.      Given that whether a statement, said to have been made by a witness, is producible is a question for the Court not the prosecutor, and where a witness testifies certain statements and the like existed, due process requires the Court, rather than rely on naked, unsworn representations by the prosecutor, to conduct an inspection of the documents themselves.

VI.      An accused is denied due process when a prosecutor argues to the jury that certain accusatory statements (attributed to a non-testifying declarant), should be disregarded as substantive evidence when the prosecutor should have known such statements could not properly be considered by the jury as proof of the accused's guilt.

VII.      An accused's right of confrontation was violated, as was the hearsay rule, when various witnesses were allowed to testify not simply that the decedent was fearful of the accused, but also as to the reason for that fear.

VIII.      A prosecutor is guilty of misconduct when he tells the jury, without a factual basis, the accused told his daughter he killed the decedent and when he inferentially accuses defense counsel of lying for having argued there was no such evidence in the record.

7

IX.     Counsel for the State was guilty of misconduct when he argued that
        threats supposedly made against the witness accounted for her failure to
        agree with the critical import of many of his questions.

(Doc. No. 9-1, Exh. 17.)  The State filed a brief in response.  (Doc. No. 9-1, Exh. 18.)

On December 5, 2001, the Supreme Court of Ohio declined jurisdiction to hear the case

and dismissed the appeal as not involving any substantial constitutional question.  (Doc. No. 9-1,

Exh. 19.)  Fortson did not seek further review in the United States Supreme Court.

**C.      Application to Reopen Appeal under Ohio App. R. 26(B)**

Meanwhile, on November 27, 2001, Fortson filed in the state appellate court a *pro se*

Application to Reopen Appeal pursuant to Ohio App. R. 26(B), which he styled as a "Motion for

Reconsideration 26(B)(2)(d).  (Doc. No. 9-1, Exh. 20.)  Fortson's Application  raises the

following arguments:

I.      Appellate counsel . . .  was deficient with respect to his knowing failure
        to produce a trial record for the basis of the appeal.

II.     Appellate counsel . . .  was deficient with respect to the assignments of
        error or arguments raised as he had a conflict of interest and refused to
        raise the issue of ineffective assistance of counsel at the trial court level
        as he was the trial attorney in the case at bar.

III.    Failure of defense and appellate counsel . . . to raise a statute of
        limitations defense as it applied to the conspiracy charge constituted
        ineffective assistance of counsel.

(Doc. No. 9-1, Exh. 20.)  Fortson attached numerous affidavits to his Application, including the

affidavits of co-defendant Robbie Robertson, Angela Isom, Sherman Flakes, Robin DeFleice,

Sadie Scott, Havannia Wade, and Glenda Anderson.  (*Id.*)  In the affidavits, these individuals

generally aver they do not believe Fortson killed, or would have killed, the victim Elaine Lovett.

(*Id.*)  Several of the affiants also state they offered to testify on Fortson's behalf, but were

8

rebuffed by trial counsel.  (*Id.*)

On December 11, 2001, the state appellate court denied Fortson's Application as both untimely and meritless.  (Doc. No. 9-1, Exh. 22.)

Fortson did not appeal to the Supreme Court of Ohio.  Rather, on January 23, 2002, Fortson filed a "Motion for Delayed Reconsideration to Reopen" in the state appellate court. (Doc. No. 9-1, Exh. 23.)  Therein, he raised the following three grounds for relief:

I.      Appellant's counsel . . . knowingly failed to call witnesses available. Which in turn produced a defenseless trial record for appeal.

II.     Due to the conflict of interest [appellate counsel] was deficient in raising the assignment of error of ineffective assistance during trial and appellate procedures.

III.    The appellant's counsel . . . failed to raise the statute of limitations for conspiracy to commit murder, even though the conspiracy charged was nolled during trial.  The appellant's counsel allowed the prosecutor to utilize the conspiracy theory causing the conviction of aggravated murder.

(Doc. No. 9-1, Exh. 23.)

On February 6, 2002, the state appellate court denied Fortson's motion on the grounds that "successive applications to reopen are not permitted; moreover, the application is untimely and Mr. Fortson has not established good cause of late filing."  (Doc. No. 9-1, Exh. 25.)  In addition, the state appellate court noted that: "Mr. Fortson raises the identical arguments in this motion that he raised in his first application, and the court rejected them.  Those arguments are still unpersuasive and are now barred by *res judicata*."  (*Id.*)

Fortson did not seek further review in the Supreme Court of Ohio.

**D.      First Federal Petition for Writ of Habeas Corpus**

Thereafter, on August 9, 2002, Fortson filed a *pro se* Petition for Writ of Habeas Corpus

9

in this Court, raising the following five grounds for relief:

**GROUND ONE**: Insufficient evident.

**SUPPORTING FACTS**: There was blood, a bloody footprint, fingerprints, a murder weapon and DNA found at the crime scene, none of which belong to the petitioner.  There was no evidence or witnesses provided by the State to prove that
the Petitioner killed the decedent.  As the counsel for the State said (himself) in his opening statement to the courts "The police has NO physical evidence linking the defendant Andrew Fortson to this crime.  The evidence presented by the state does not support the True Bill Indictments.  These facts support the statement the Petitioner's counsel stated in his brief to the Eighth District of Ohio.

**GROUND TWO**: Prosecutorial misconduct and irregular court proceedings.

**SUPPORTING FACTS**: The prosecution nolled the conspiracy charge against Petitioner in Count One.  The transcripts clearly show that conspiracy to commit aggravated murder was rewritten.  The petitioner was charged with conspiracy to commit aggravated murder after the statute of limitation had expired in 1984.  The
petitioner was denied due process when counsel for the state asked a series of leading questions at the petitioner's daughter, which the effect supplying her with "a false memory" of what she told police, worse yet these questions were asked without any factual foundation.  Andee Caver, states witness actual testimony as to what she said, and not what the state prosecutor wanted her to say is located in (Ex. 39).

**GROUND THREE**: Right to confrontation and 5th Amendment Rights were violated.

**SUPPORTING FACTS**: The court allowed the jury to consider hearsay evidence from states witness Tina Heimer stating "Glenda Anderson came up missing" in July or August of 1978" and who's body was never found."  Counsel for petitioner could not have cross-examine states witness Tina Heimer effectively.  When the fact remains that Glenda Anderson is alive and well. [sic]

**GROUND FOUR**: Ineffective Assistance

**SUPPORTING FACTS**: The petitioners Due Process rights to effective assistance was violated when counsel refuse to provide rebuttal testimony with witnesses for the petitions defense.  There were witnesses willing to make themselves available to testify on petitioners behalf.  Petitioners counsel told potential witness, petitioner would not need witnesses.  Affidavits listed are

10

witnesses who would of made a difference in the out come of the trial if given the chance to testify to the truth.  Counsel for the petitioner did not use one witness.  Counsel fail to raise the statute of limitation on conspiracy.  The Eighth District Court of Appeals stated in its opinion, Motion No. 33817 dated December 11, 2001 page 4, 1st paragraph "this argument is really ineffective assistance of trial counsel. [sic]

**GROUND FIVE**: Prejudiced by the Eighth District Court of Appeals and denied due process.

**SUPPORTING FACTS**:  The Eighth District prejudiced the petitioner when it stated in its opinion that the petitioners [sic] indictment for conspiracy to commit aggravated murder was nolled.  When in fact the petitioner was still indicted and charged with conspiracy to commit aggravated murder.  The courts clearly stated the petitioners daughter admitted that she told Euclid police in 1991 "that defendant confess to killing Little Bit" there was no testimony in the transcript to support these allegations.  The petitioner was denied Due Process of Appellate review when the Eighth District court stated it's opinion as fact that "Chris another one of the prostitutes who worked for defendant" "came up missing"" in July or August 1978: and her body was never found".  Affirmed August 13, 2001 page 18.  Glenda Anderson a.k.a. Chris is alive and well.

(Doc. 9-1, Exh. 26.)  *See also Fortson v. Thomas*, Case No. 1:02CV1575 (N.D. Ohio) (O'Malley, J.)  Respondent Linda Thomas filed her Return of Writ on November 8, 2002, and Fortson thereafter filed a Traverse.  (Doc. Nos. 9-2, Exhs. 27, 28.)

On March 13, 2003, Fortson filed a "Motion to Withdraw Writ of Habeas Corpus, Without Prejudice, in Order to Exhaust State Claims."  (Doc. No. 9-2, Exh. 29.)  On April 21, 2003, the Court granted Fortson's unopposed motion to withdraw his petition without prejudice and dismissed the case.  (Doc. No. 9-2, Exh. 30.)

**E.      First Delayed Motion for New Trial**

Meanwhile, on November 4, 2002, Fortson filed his first delayed motion for new trial in the state trial court.  (Doc. No. 9-2, Exh. 31.)  Fortson attached the affidavits of Robert Caver, Andee Caver, Brenda Caver, and Glenda Anderson, and claimed they constituted newly

11

discovered evidence warranting a new trial.[2]  (*Id.*)  Several weeks later, he supplemented his delayed motion for new trial with the affidavits of Robbie Robertson, Sadie Scott, Glenda Anderson, Havannia Wade, and Angela Isom.  (Doc. No. 9-2, Exh. 32.)  The State opposed Fortson's motion.  (Doc. No. 9-2, Exh. 33.)

On February 6, 2003, the state trial court denied Fortson's delayed motion for new trial. (Doc. No. 9-2, Exh. 34.)  The court found Fortson's motion was untimely and that he had failed to demonstrate he was unavoidably prevented from discovering the new evidence.  (*Id.*)  The court also determined that, "even if Defendant had demonstrated that he was unavoidably prevented from discovering the evidence he now possesses, this alleged new evidence does not lead the Court to believe that there would be a strong probability of altering the trial's outcome." (*Id.*)  Lastly, the court rejected Fortson's claims of prosecutorial misconduct and ineffective assistance of counsel.  (*Id.*)

On March 3, 2003, Fortson filed a notice of appeal to the state appellate court.  (Doc. No. 9-2, Exh. 35.)  In his merit brief, Fortson raised the following three assignments of error:

I.      The court abused its discretion when it denied Appellant an evidentiary hearing and a new trial.  After reviewing the factual based facts through the institutional release papers of Robert Caver, Brenda Caver, and Andee Caver, the court still 'refuse' to acknowledge the Appellant's reasoning through his new evidence as proof he was unavoidably prevented from discovering the existence of the evidence supporting the grounds for his new trial motion.

II.     The court abused its discretion when it reviewed the affidavits and the video tape personally addressing the court exposing perjury by '3' State's witnesses, along with the prosecutor it still fail to grant an evidentiary

---

[2]  In their affidavits, Brenda and Andee Caver averred they were coerced by the police and prosecutors to testify against Fortson, and recanted their trial testimony.  (Doc. No. 9-2, Exh. 31.)  These affidavits are both dated from June 2002.  (*Id.*)

12

hearing and or a new trial.

III.     The court abused its discretion when after reviewing all the new evidence, did not acknowledge Coercion, Intimidation, Prejudice, Ineffective Assistance, and Tampering with Evidence as proof that Appellant received an unfair trial and should have been granted a new trial and or an evidentiary hearing.

(Doc. No. 9-2, Exh. 36.)

On October 9, 2003, the state appellate court affirmed the trial court's denial of Fortson's motion, finding Fortson failed to demonstrate he was unavoidably prevented from discovering the "new evidence" or that it would have changed the outcome of the trial. (Doc. No. 9-2, Exh. 37.)

On October 20, 2003, Fortson filed a Motion for Reconsideration, which was denied by the state appellate court on October 31, 2003. (Doc. No. 9-3, Exhs. 38, 39.)

**F.     State Habeas Corpus Petitions**

The record reflects Fortson filed a total of five (5) state habeas petitions between October 2003 and September 2005. *See generally* Doc. No. 9-3. These petitions are summarized, below.

Fortson filed his first state habeas petition on October 3, 2003 in the Court of Appeals for the Ninth Appellate District (Lorain County). (Doc. No. 9-3, Exh. 40.) In his brief, Fortson raised the following six grounds:

**GROUND ONE:** The Court fail to recognize the Statute of Limitations R.C. 2901.13(A)(1) pursuant to CONSPIRACY R.C. 2923.01. The Statute of limitation for ANY crime is (6) years, for ANY CRIME, except aggravated murder and murder.

**GROUND TWO**: The Court fail to recognize the courts lost jurisdiction of person and subject matter, when the prosecution included the mere word CONSPIRACY TO Relators Indictment and Bill of Particulars, pursuant to O.R. 2901.13 (A)(1).

13

**GROUND THREE**: The Court of Common Pleas fail to recognize this whole court proceeding is unlawful,

>   A) The prosecution did not have jurisdiction to present the indictment of CONSPIRACY to a Grand Jury

>   B) The Grand Jury did not have jurisdiction to return an indictment for CONSPIRACY.

>   C) The Courts did not have jurisdiction to allow the prosecution to try the Relator with a CONSPIRACY count.

**GROUND FOUR**: The Courts fail to recognize they did not have legal authority or jurisdiction to sentence the Relator to prison.

**GROUND FIVE**: The Eighth District Court of Appeals errored in their AFFIRMED opinion filed December 11, 2001.  They mistakenly said the Relators conspiracy charge was nolled during trial, (Ex. 35)(Pg. 6) Exhibit 34, is
the not guilty return verdict of the Jury, of the CONSPIRACY COUNT. (Ex. 34)

>   A) The Eighth District Court mistakenly stated in part:

>   1) "Mr. Fortson's final argument is that his appellate counsel was ineffective for failing to raise the defence of the statute of limitation as it applied to the CONSPIRACY CHARGE.  The Grand Jury indicted Mr. Fortson for aggravated murder and CONSPIRACY to commit murder.  However, this argument fails because Mr. Fortson cannot establish prejudice for the failure to raise the defence of the statute of limitations. (Ex. 35)(Pg. 5)(Emph. added)

>   B) The Eighth District Court also error in their judgment when considering their Opinion of the Relators AFFIRMED APPEAL.

>   Stating in Part: 2) In the present case there can be no prejudice for the failure to raise the statute of limitation defence of CONSPIRACY CHARGE because the COSPIRACY CHARGE WAS "NOLLED" during trial. (Ex. 35)(Pg. 6)(Emph. added)

**GROUND SIX**: The Relator presents this court with "FACT" of law proving the "state is unlawfully detaining him in prison, by ERROR of the

14

> Court
> of Common Pleas and the Eighth District Court of Appeals.  THIS CRIME
> TOOK PLACE IN 1978.  THE RELATOR WAS INDICTED AND TRIED
> WITH A CONSPIRACY COUNT IN THE YEAR 2000.  (22 YEARS
> LATER THE COURTS LOST JURISDICTION IN 1984).

(Doc. No. 9-3, Exh. 40.)  The State filed a motion to dismiss the petition on October 17, 2003.

(Doc. No. 9-3, Exh. 41.)

On December 9, 2003, in Case No. 03CA8355, the Ninth District Appellate Court

granted the State's motion, finding "[t]here is nothing on the face of Petitioner's petition

demonstrating that he has any right to relief in habeas corpus."  (Doc. No. 9-3, Exh. 42.)  Fortson

then filed, on December 16, 2003, a "Motion to Correct the Record for the Reconsideration of

Habeas Corpus," in which he argued the appellate court "rendered its opinion on dubious,

unsupported insinuations."  (Doc. No. 9-3, Exh. 43.)  It does not appear the Ninth District

Appellate Court ruled on Fortson's motion.

On December 19, 2003, Fortson appealed to the Supreme Court of Ohio. (Doc. No. 9-6,

Exh. 110.)  Both parties filed merit briefs.  (*Id*.)  On April 28, 2004, the Supreme Court of Ohio

affirmed the Ninth District Appellate Court's dismissal of Fortson's petition.  (Doc. No. 9-3,

Exh. 44 and Doc. No. 9-6, Exh. 110.)  *See also State ex rel. Fortson v. Kelly*, 102 Ohio St.3d 77

(2004).

Thereafter, on March 1, 2004, Fortson filed his second state habeas petition, also in the

Ninth Appellate District.  (Doc. No. 9-3, Exh. 45.)  In this petition, he argued as follows:

> The court was without jurisdiction to find Relator guilty of aggravated murder
> in Case No. CR 385443.  Count One, aggravated murder, in Case No. 385443
> was nolled by the prosecution.  Andrew Fortson, the Relator, was reindicted in
> Case No. 389991 without an aggravated murder count, which amount to
> effective failure to produce an indictment in the new Case No. 389991 for the
> crime of aggravated murder with prior calculation and design and could not be

15

cured by ignoring this fact, or waived by Relator or Relator's attorney.

(*Id.*)

On March 24, 2004, Fortson moved to strike his habeas petition on the grounds he had been transferred from the Lorain Correctional Institution to Mansfield Correctional Institution and was, therefore, no longer in the jurisdiction of the Ninth Appellate District.  (Doc. No. 9-3, Exh. 46.)  On April 2, 2004, the Ninth District Appellate Court granted the motion and dismissed the petition.  (Doc. No. 9-3, Exh. 47.)

Over a year later, on July 27, 2005, Fortson filed his third state habeas petition, in the Fifth District Appellate Court.  (Doc. No. 9-3, Exh. 48.)  He again argued the state trial court lacked jurisdiction to find him guilty of aggravated murder.  (*Id.*)  On August 5, 2005, the Fifth District Appellate Court dismissed Fortson's petition on the grounds it was "fatally defective for failure to comply with R.C. 2725.04(D)."  (Doc. No. 9-3, Exh. 49.)

On August 19, 2005, Fortson filed his fourth state habeas petition, again in the Fifth District Appellate Court.  (Doc. No. 9-3, Exh. 50.)  Shortly thereafter, on August 26, 2005, the Fifth District Appellate Court once again dismissed Fortson's petition as "fatally defective for failure to comply with R.C. 2725.04(D)."  (Doc. No. 9-4, Exh. 51.)

On September 22, 2005, Fortson filed his fifth (and final) state habeas petition, again in the Fifth District Appellate Court.  (Doc. No. 9-4, Exh. 52.)  Therein, he presented one ground for relief:

> **GROUND ONE**: The Court was without jurisdiction to find Relator guilty of aggravated murder, in Case No. CR 99 385443, for it was nolled by the prosecution May 3, 2000.  (T. 4) Andrew Fortson, the Relator, was re-indicted in Case No. 389991, without aggravated murder, which amounted to effective failure to produce an indictment in NEW CASE No. CR 38991, for the crime of aggravated murder with prior calculation and design and could not be cured by

16

ignoring this fac, or waived by Relator or Relator's Attorney.

(Doc. No. 9-4, Exh. 52.)  The State filed a motion to dismiss.  (Doc. No. 9-4, Exh. 53.)

On November 8, 2005, the Fifth District Appellate Court dismissed the petition, as

follows:

> In this case, upon review, this Court finds that the trial court did not dismiss the
> indictment for aggravated murder and, therefore, Relator is being properly held
> by Respondent for the conviction and sentence on the aggravated murder
> charge.  Additionally, both the Ninth District Court of Appeals and the Ohio
> Supreme Court have found that Relator's jurisdictional claim lacks merit.  For
> these reasons, the Court finds that Relator's claim is precluded for review,
> pursuant to the doctrine of *res judicata* and, additionally, that Relator's claim
> fails to state a claim upon which relief may be granted.  Accordingly,
> Respondent's Motion to Dismiss is well taken and is hereby granted.  Relator's
> Petition for Writ of Habeas Corpus is hereby dismissed.

(Doc. No. 9-4, Exh. 56.)

Fortson then filed a notice of appeal to the Supreme Court of Ohio on December 15,

2005.  (Doc. No. 9-4, Exh. 57.)  In his merit brief, Fortson raised the following three

Propositions of Law:

> I.    Prosecution of a criminal case is set aside when it is Nolle Prosequi,
>       pursuant to R.C. 2941.33.
>
> II.   Ohio Supreme Court held, the doctrine of res judicata does not apply
>       when the State lacks subject matter jurisdiction.
>
> III.  When Appellant was prosecuted by the State on an indictment which
>       was nolled, it amounted to plain error, pursuant to Cr. 52(B) and can not
>       be ignored.

(Doc. No. 9-4, Exh. 58.)  The State filed a brief in response.  (Doc. No. 9-4, Exh. 59.)

On May 24, 2006, the Supreme Court of Ohio affirmed the Fifth District Appellate

Court's judgment, finding "the court of appeals properly dismissed Fortson's petition because

res judicata barred Fortson from filing a successive habeas corpus petition."  (Doc. No. 9-4,

17

Exhs. 60, 61.)  *See also Fortson v. Bradshaw*, 109 Ohio St.3d 250 (2006).

**G.     State Post-Conviction Proceedings**

Meanwhile, on December 2, 2003, Fortson, through counsel, filed a "Motion to Correct the Record and Vacate Conviction" in state trial court.  (Doc. No. 9-4, Exh. 62.)  Therein, Fortson argued the court was without jurisdiction to find him guilty of aggravated murder because that count was allegedly nolled by the State.  (*Id.*)  The State filed a brief in opposition. (Doc. No. 9-4, Exh. 63.)

On July 15, 2004, the state trial court summarily denied Fortson's motion.  (Doc. No. 9-4, Exh. 64.)  Several months later, on October 1, 2004, Fortson filed a motion requesting findings of fact and conclusions of law.  (Doc. No. 9-4, Exh. 65.)  The trial court filed its Findings of Fact and Conclusions of Law on November 30, 2004.  (Doc. No. 9-4, Exh. 66.)  The court found that "a review of the transcript and journal entries entered by the Court establish that the Aggravated Murder count in Case Number 385443 was not nolled."  (*Id.*)  The court further concluded as follows:

1. The Court concludes that the transcript establishes that the Court, the State of Ohio, and defendant understood that count two only of Case Number 385443, the conspiracy count, was nolled, to be replaced by the conspiracy count in Case Number 389991.

2. The Court concludes it speaks only through its journal entries (See *State v. Harris* (April 8, 2004), Cuyahoga App. No. 83391), and the court's entry states that count two, the conspiracy count in Case Number 385443 was nolled.

3. The Court concludes that defendant's claim that the court was without jurisdiction to find defendant guilty was a claim capable of being raised on direct appeal, which defendant failed to do.  Accordingly, defendant's claim is barred by *res judicata*.

(*Id.*)

18

On August 6, 2004, Fortson filed a notice of appeal to the Eighth District Court of

Appeals ("state appellate court").  (Doc. No. 9-4, Exh. 67.)  Two days later, he filed a motion

requesting to dismiss the appeal as prematurely filed. (Doc. No. 9-4, Exh. 68.)  The state

appellate court granted Fortson's motion to dismiss on September 1, 2004.  (Doc. No. 9-4, Exh.

69.)

On August 13, 2004, Fortson filed another appeal to the state appellate court.  (Doc. No.

9-4, Exh. 70.)  In his merit brief, Fortson raised the following six assignments of error:

> I.    The Court erred and abused its discretion when it did not vacate
>       conviction after acknowledging the nolling of the aggravated murder
>       charge in Case No. 385443 (count one).
>
> II.   The Court erred and abused its discretion in refusing to acknowledge the
>       fact that Defendant is incarcerated for aggravated murder "WITHOUT"
>       a valid indictment.
>
> III.  The Court erred and abused its discretion when it did not correct the
>       record as requested by Defendant.
>
> IV.   The Court erred and denied Defendant Due Process when Judge
>       Kathleen Sutula refuse to provide Findings of Fact and Conclusions of
>       Law in her denial Motion to Correct the Record and Vacate Conviction.
>
> V.    The Court abused its discretion and denied Due Process when it
>       neglected to mail Defendant a copy of the denial Journal Entry of the
>       Motion to Correct the Record and Vacate conviction.
>
> VI.   The Court erred and abused its discretion when it fail to acknowledge
>       Defendant's trial conviction and sentence is void ab initio, in regards to
>       aggravated murder in Case No. 385443, the court was without
>       jurisdiction.

(Doc. No. 9-4, Exh. 71.)  The State filed a brief in opposition on March 8, 2005.  (Doc. No. 9-4,

Exh. 73.)  Puzzlingly, the State's brief listed ten assignments of error, which it claimed were

raised in Fortson's brief.  (Doc. No. 9-4, Exh. 73.)

19

On May 19, 2005, the state appellate court issued an Opinion affirming the trial court's denial of Fortson's motion to correct the record and vacate his conviction.  (Doc. No. 9-5, Exh. 75.)  In the decision, the state appellate court summarized Fortson's grounds for relief as follows:

> In his ten assignments of error, appellant essentially sets forth the following four issues for our review: (1) whether the aggravated murder count was dismissed by the State and, thus, the conviction for same void; (2) whether appellant was denied due process of law by the trial court's alleged failure to provide him with findings of fact and conclusions of law; (3) whether appellant was denied due process of law by the trial court's alleged failure to mail him a copy of its entry denying his motion to correct the record and vacate his conviction; and (4) whether the trial court erred in finding that appellant's claim was barred by the doctrine of *res judicata*.

(*Id*.)  The state appellate court found each of Fortson's arguments to be without merit.  (*Id*.)

Fortson filed a *pro se* motion for reconsideration on May 26, 2005, which the State opposed.  (Doc. No. 9-6, Exh. 117.)  On June 6, 2005, the state appellate court denied Fortson's motion via journal entry.  (Doc. No. 9-5, Exh. 76.)

On June 13, 2005, Fortson filed a notice of appeal to the Supreme Court of Ohio.[3]  (Doc. No. 9-5, Exh. 77.)  On September 7, 2005, the Supreme Court of Ohio declined jurisdiction to hear the case and dismissed the appeal as not involving any substantial constitutional question. (Doc. No. 9-5, Exh. 78.)

Over two years later, on December 31, 2007, Fortson filed a *pro se* "Motion for Post-Conviction Relief Pursuant to Revised Code § 2953.23."  (Doc. No. 9-5, Exh. 79.)  In his

---

[3] A search of the Supreme Court of Ohio docket indicates Fortson filed a Memorandum in Support of Jurisdiction on the same date he filed his Notice of Appeal. Respondent did not include Fortson's jurisdictional memorandum in the habeas record; however, the Court finds it is not material to a resolution of the instant Petition.

motion, Fortson claimed that, on August 2006, he received an affidavit containing the "sworn confession from Charles Tolliver admitting to the murder of Elaine Lovett (aka Little Bit), the victim in Case No. 385443." (*Id.*) Fortson attached the affidavit as an exhibit to his petition along with a videotape which he described as "new evidence which will support my claim of actual innocence." (*Id.*) He raised the following assignments of error:

I.  Trial Counsel failed to object to Petitioner being prosecuted with a statutorily time-barred conspiracy charge contained in both Indictment and the Bill of Particulars.

II.  Trial Counsel failed to investigate.

III.  Counsel was ineffective at trial level.

IV.  Counsel fail to ask for an Acquittal under Rule 29, citing there is not a valid Indictment for aggravated murder in Case No. 385443.

V.  Counsel's failure to interview or investigate witnesses on Petitioner's behalf caused perjured testimony to be utilized at trial without detection.

VI.  Actual innocence.

(Doc. No. 9-5, Exh. 79.) The State filed a brief in opposition on January 7, 2008. (Doc. No. 9-5, Exh. 80.) Fortson then filed a supplement his petition, as well as a response to the State's opposition. (Doc. Nos. 9-5, Exhs. 81, 82.)

On January 16, 2008, the state trial court summarily denied Fortson's post-conviction petition. (Doc. No. 9-5, Exh. 83.)

Forston filed a notice of appeal on February 13, 2008 to the state appellate court. (Doc. No. 9-5, Exh. 84.) In his merit brief, Fortson raised the following assignments of error:

I.  The lower court erred and abused its discretion in denying Appellant's post-conviction relief, pursuant to the Case law in Schlup v. Delo and Murray v. Carrier.

21

> II.    The lower court erred and abused its discretion in denying Appellant an
> evidentiary hearing on his petition for post-conviction relief.

(Doc. No. 9-5, Exh. 85.)  The state appellate court *sua sponte* dismissed the appeal on March 24,

2008.  (Doc. No. 9-5, Exh. 86.)  It does not appear Fortson sought further review in the Supreme

Court of Ohio.

**H.**    **Second Delayed Motion for New Trial**

    Over five years later, on September 20, 2013, Fortson, through counsel, filed a "Motion

for Leave to File Delayed Motion for New Trial" and "Delayed Motion for New Trial based on

newly discovered evidence.  (Doc. No. 9-5, Exhs. 87, 88.)  In his motion for leave, Fortson

explained:

> This newly discovered evidence consists of statements and police notes
> regarding statements of Ann Coulter, Archie Jones, Ronald Harris, Havannia
> Fails, and Curtis Melton that were withheld by the prosecution but later released
> as public record.  The withheld evidence clearly supports Mr. Fortson's long
> standing claim of innocence.  Mr. Fortson was unavoidably prevented from the
> discovery of the evidence within the 120 day period following the jury verdict
> in this matter.

(Doc. No. 9-5, Exh. 87)  The state trial court summarily denied Fortson's motion for leave to file

delayed motion for new trial, and the delayed motion for new trial, on November 5, 2013.  (Doc.

No. 9-5, Exh. 89; Doc. No. 9-6, Exh. 90.)

    On December 4, 2013, Fortson, proceeding *pro se*, filed a notice of appeal to the state

appellate court.  (Doc. No. 9-6, Exh. 91.)  In his merit brief, Fortson raised the following three

assignments of error:

> I.    The trial court abused its discretion when it denied Defendant-
> Appellant's motion for new trial without addressing his motion for leave
> to file delayed motion for new trial and granting a hearing thereon;
> thereby denying his 14th Amendment rights to due process under the
> United States constitution and the State's constitutional equivalents.

22

II.      Trial court erred to the prejudice of Defendant-Appellant and abused its discretion when it ruled on Defendant-Appellant's Delayed Motion for New Trial without allowing sufficient time within which to request leave to reply to State's Response in Opposition to Defendant's Motion for Leave to File Delayed Motion for New Trial pursuant to Cuyahoga County Court of Common Pleas Local Rule 11(D).

III.     Defendant-Appellant's conviction is void and/or deserving of an evidentiary hearing due to the State's failure to disclose evidence which demonstrates the prosecution's knowing use of perjured testimony to obtain the conviction in contravention of Defendant-Appellant's 5th, 6th, and 14th Amendment rights under the United States Constitution and State Constitutional equivalents.

(Doc. No. 9-6, Exh. 92.)  The State filed a brief in opposition, to which Fortson replied.  (Doc. No. 9-6, Exhs. 93, 94.)

On August 28, 2014, the state appellate court affirmed, noting the appeal was limited to the trial court's decision to deny Fortson leave without a hearing.  (Doc. No. 9-6, Exh. 95.)  *See also State v. Fortson*, 2014 WL 4261838 (Ohio App. 8th Dist. Aug. 28, 2014).

On September 15, 2014, Fortson filed a motion for reconsideration, which the state appellate court denied as untimely under Ohio App. R. 26(A).  (Doc. No. 9-6, Exhs. 96, 97.)  On October 17, 2014, Fortson filed a "Delayed Brief for Reconsideration," which the state appellate court denied on October 21, 2014.  (Doc. No. 9-6, Exhs. 98, 99, 100.)

On November 4, 2014, Fortson filed a delayed notice of appeal and memorandum in support of jurisdiction to the Supreme Court of Ohio.  (Doc. No. 9-6, Exh. 101.)  On December 24, 2014, the Supreme Court of Ohio denied Fortson's motion for delayed appeal and dismissed the appeal.  (Doc. No. 9-6, Exh. 102.)

**I.      Federal Habeas Petition**

23

On September 29, 2015,[4] Fortson filed a Petition for Writ of Habeas Corpus in this Court and asserted the following grounds for relief:

**GROUND ONE**: Petitioner's right to due process and Confrontation of Witnesses under the Fifth and Fourteenth Amendments of the United States Constitution were violated.

    (i)     Petitioner was denied a fair trial when the trial court denied Petitioner's "Motion for a Separate Trial and Relief from Prejudicial Joinder" and the Petitioner's motion for a mistrial.

    (ii)    The Petitioner's right of confrontation and the hearsay rule were violated when the trial court allowed the jury to consider a plethora of hearsay evidence.

    (iii)   The admission of the written statements (including comments) made by the co-defendant (who must be viewed as a non-testifying declarant, as that term is defined in Rule 801(b), Ohio Rules of Evidence) as substantive proof of the Petitioner's guilt violated the hearsay rule.

    (iv)   The Petitioner was denied a fair trial and the Petitioner's right of confrontation was violated when the trial court refused to allow the defense to cross-examine a witness as to certain omissions from the witness' written statement.

**GROUND TWO**: Petitioner's rights to due process under the Fifth and Fourteenth Amendments of the United States Constitution were violated by numerous instances of prosecutorial misconduct.

    (i)     The State was guilty of misconduct and the Petitioner denied due process in the wake of the trial court's validating the State's objections to the defense making full use of the witness Tina Heimer's statement to the police.

    (ii)    Due process was denied Petitioner when counsel for the State

---

[4]  Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner delivers it to prison authorities.  *See Houston v. Lack*, 487 U.S. 266 (1988).  While the Petition herein did not arrive at the Court for filing until October 7, 2015, Fortson states that he placed it in the prison mailing system on September 29, 2015.  (Doc. No. 1 at 39.)  Thus, the Court will consider the Petition as filed on September 29, 2015.

asked a series of leading questions directed at the Petitioner's daughter, which questions had the effect of either supplying her with a 'false memory' of what she had told the police, or worse yet, were asked without a factual foundation and thus insinuated the Petitioner actually had caused not only the decedent's death but another persons as well.

(iii)     Counsel for the States was guilty of misconduct when he argued, without a factual basis, that the Petitioner had told his daughter he killed the decedent and that defense counsel's argument in response thereto was flawed.

(iv)     The prosecutor was guilty of misconduct in the wake of his gross insinuations and suggestions that the Petitioner's daughter had been threatened and that these threats accounted for her asserted reluctance to testify against the Petitioner and arguably accounted for the witness' testimony having been weak and inconsistent.

(v)     Given that it is unprofessional for a prosecutor to intentionally refer to, or argue the basis of facts outside the Record; to insinuate the existence of facts for which no proof was offered; and to denigrate the legitimate efforts of counsel or personally attack his ethics and integrity, it follows the prosecutor's actions assailed herein must be regarded as misconduct sufficient enough to deprive the Petitioner of a fair trial.

**GROUND THREE**: Petitioner's rights to due process under the Fifth and Fourteenth Amendments of the United States Constitution were violated by the trial court.

(i)     The trial court denied Petitioner due process when it failed to require the State to produce copies of all statements, interview notes, summaries and the like that included any comments made by, or attributed therein to, various witnesses, including Jackie Colter (or any other name used by her at the time (Ann Colter)) in her various interviews.

**GROUND FOUR**: Petitioner's right to due process and a fair trial under the Fifth and Fourteenth Amendments of the United States Constitution were violated by prosecutorial misconduct in creating a false impression of witnesses testimony and failing to correct testimony it knew to be false through incarcerating witnesses  and making it appear as though their reluctance to testify was a direct result of their fear of and testifying against the Petitioner rather than being coerced by the State to testify falsely.

25

(i)     The prosecutor knowingly created false impressions, implications, and used improper insinuations calculated to mislead the jury through leading questions posed to the witnesses for the State and thereby making it appear to the jury that they testified to facts not contained in the record before them.

(ii)    The prosecutor knowingly used false testimony to obtain Petitioner's conviction.

(iii)   The State's witnesses having recanted and indicating they testified falsely for the State is indicative of the verity of Grounds 1-3 and 5-6.

**GROUND FIVE**: Petitioner's rights to due process and a fair trial under the Fifth and Fourteenth Amendments of the United States Constitution were violated by the State when it violated the tenants of Brady v. Maryland and its progeny by suppressing exculpatory evidence which demonstrates the prosecutions knowing use of false testimony to obtain the conviction of Petitioner.

(i)     The State failed to correct testimony it knew to be false by failing to disclose all statements, interview notes, summaries and the like that included any comments made by, or attributed to, various witnesses, including Jackie Colter (or any other name used by her at the time, i.e., Ann Colter) in her various interviews.

(ii)    Even if the interview notes, summaries and the like may not have been admissible or could not have been defined as a 'statement,' they were discoverable under Brady since their disclosure led to the discovery of admissible evidence or would have resulted in the discovery of admissible evidence.

'

**GROUND SIX**: Petitioner's rights to due process and a fair trial under the Fifth and Fourteenth Amendments of the United States Constitution were violated when the State denied him a meaningful opportunity to present a complete defense to the charges of which he was convicted for.

**GROUND SEVEN**:   Petitioner's right to due process and effective assistance of counsel under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution where the same counsel represented Petitioner at trial and on appeal.

(i)    Appellate counsel was constitutionally deficient in his representation of Petitioner when he failed to raise the statute of limitations defense to the conspiracy to commit murder charge. *See, State v. Tolliver*, 146 Ohio App.3d 186 (2001).

26

(Doc. 1.)[5]  In addition, Fortson was granted leave to amend his petition to add the following

claim as his eighth ground for relief:

> **GROUND EIGHT**: When the prosecutor, grand jury, trial court, and trial jury
> utilized an expired conspiracy count, petitioner's due process rights under the
> 14th Amendment was violated, which caused petitioner to receive an unfair trial.
>
> > (i)     The conspiracy count the prosecutor utilized in the year '2000'
> >         had expired the statute of limitations for prosecution in 1984.
> >
> > (ii)    Throughout considering the innocence or guilt process an
> >         expired conspiracy count was utilized by the prosecutor, grand
> >         jury, trial court, and trial jurors.
> >
> > (iii)   Excluding the utilization of conspiracy, petitioner would not
> >         have had a trial.

(Doc. Nos. 22, 25.)

On May 23, 2016, Warden LaShaunn Eppinger ("Respondent") filed his Return of Writ.[6]

(Doc. No. 28.)  Thereafter, on June 14, 2016, Fortson moved for appointment of counsel.  (Doc.

No. 32.)  Fortson's motion was denied via Order dated June 17, 2016.  (Doc. No. 33.)

---

[5]  On November 17, 2015, Fortson filed an "Amendment to Habeas Petition," in which he offered additional argument in support of the grounds raised in his initial Petition. (Doc. No. 4.)

[6]  On February 12, 2016, Respondent filed a Motion to Dismiss the petition as time-barred. (Doc. No. 9.)  This motion rested entirely on Respondent's argument that Fortson's petition was untimely under 28 U.S.C. § 2244(d), and did not address either the merits of Petitioner's claims or any potential issues regarding exhaustion and/or procedural default.  On February 24, 2016, Magistrate Judge Nancy Vecchiarelli (who was then assigned to the case) issued an Order denying Respondent's motion without prejudice subject to the filing of the Return. (Doc. No. 10.)  Judge Vecchiarelli ordered Respondent to file a Return that "presents a complete response to the petition," including arguments relating to the statute of limitations, exhaustion and/or procedural default, and the merits of Petitioner's claims.  (*Id*.) Respondent filed objections to Judge Vecchiarelli's Order (Doc. No. 13), which were overruled.  (Doc. No. 21.)

27

On August 11, 2016, Fortson filed a Motion to Expand the Record.  (Doc. No. 36.)  He thereafter filed a Traverse (Doc. No. 37) on August 25, 2016 along with a Motion for Evidentiary Hearing (Doc. No. 38.)  Five days later, Fortson filed a document captioned "Traverse Amendment to Return of Writ."  (Doc. No. 39.)  Respondent filed a brief in opposition to Fortson's Motion for Evidentiary Hearing on September 1, 2016.  (Doc. No. 40.)

### III.  Motion to Expand

In his Motion to Expand, Fortson asks the Court to expand the habeas record to include the following documents:

1. Undated Euclid Police Department supplementary report relating to Elaine Lovett homicide investigation.  Notes from interviews with Andrew Fortson, Alesia Anderson, Laquitta Anderson, Havannia Fails and Sonia Foneca regarding location of Glenda Anderson.  (Doc. No. 36-1 at 1.)

2. Unidentified handwritten note dated September 18, 1986 regarding Glenda Anderson.  (Doc. No. 36-1 at 2.)

3. Euclid Police Department Supplementary Report dated June 19, 1978 regarding Elaine Lovett homicide investigation.  Notes from interview with Allan Flakes. (Doc. No. 36-1 at 3.)

4. Euclid Police Department record containing transcribed interview of Andrew Fortson dated June 2, 1978, relating to Elaine Lovett homicide investigation.  (Doc. No. 36-1 at 4-7.)

5. Euclid Police Department Supplementary Report dated March 25, 1991 regarding Elaine Lovett homicide investigation.  Notes from interview with Andrew Fortson. (Doc. No. 36-1 at 8-9.)

6. Undated Euclid Police Department Supplementary Report regarding Elaine Lovett homicide investigation.  Notes from interviews with Tina Hiemer and Andrew Fortson.  (Doc. No. 36-1 at 10.)

7. Euclid Police Department Supplementary Report dated June 14, 1978 regarding Elaine Lovett homicide investigation.  Notes from interviews with Greg Mascio and Havannia Fails.  (Doc. 36-1 at 11-12.)

28

8.     Defendant Andrew Fortson's Motion for Discovery and Inspection, filed January 11, 2000 in *State v. Fortson*, Cuyahoga County Case No. 385443. (Doc. No. 36-1 at 13-19.)

9.     Euclid Police Department Supplementary Report dated June 15, 1978 regarding Elaine Lovett homicide investigation.  Notes from interview with Sonia Foneca aka Sonia Atkinson.  (Doc. No. 36-1 at 20.)

10.    Euclid Police Department Supplementary Report dated June 2, 1978 regarding Elaine Lovett homicide investigation. Notes from interview with Ronald Smith.  (Doc. No. 36-1 at 21.)

11.    Euclid Police Department Supplementary Report dated July 5, 1978 regarding Elaine Lovett homicide investigation.  Notes from interview with Charles Walker. (Doc. No. 36-1 at 22.)

Fortson does not explain why he believes these records should be included in the habeas record, merely stating that "he has realized there are a few exhibits missing."  (Doc. No. 36 at 2.)

Respondent did not timely oppose Fortson's motion.  However, in response to Fortson's Motion for Evidentiary Hearing filed August 25, 2016, Respondent filed a brief in opposition in which he argues generally that expansion of the habeas record is not permitted under *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1399, 179 L.Ed.2d 557 (2011).

Rule 7 of the Rules Governing Section 2254 Cases provides that "the Court may direct the parties to expand the record by submitting additional materials relating to the petition."  Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (2010).  "The decision of whether to expand the record, however, is within the sound discretion of the district court."  *West v. Bell*, 550 F.3d 542, 551 (6th Cir. 2008).  Because "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court," a federal habeas court may only review evidence in the record at the time of the state court proceedings.  *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1399, 179

29

L.Ed.2d 557 (2011); *Black v. Bell*, 664 F.3d 81, 91 (6th Cir. 2011). Expanding the record for limited purposes, however, falls within the discretion of the district court. *See e.g., Gordon v. Turner*, 2015 WL 3969689 at * 5 (N.D. Ohio June 30, 2015); *Conway v. Houk*, 2011 WL 249491 at *2 (S.D. Ohio Jan.26, 2011) (limiting inquiry, in resolving a motion to expand the record, to "whether the materials that Petitioner seeks to add to the record would assist the Court in determining whether an evidentiary hearing might be warranted"); *Keenan v. Bagley*, 2008 WL 4372688, at * 2 (N.D. Ohio Sep.22, 2008) (granting motion to expand the record for limited purpose of determining whether the petitioner had exercised diligence in developing the factual record in state court, but "reserv[ing] the right to exclude this evidence from consideration when it reaches the merits of [the petitioner's] claims").

Fortson's Motion to Expand the Record is granted in part and denied in part as follows. First, the Court will expand the record to include Fortson's Motion for Discovery and Inspection filed in the state trial court in *State v. Fortson*, Cuyahoga County Court of Common Pleas Case No. 385443, which is described as Item 8, above, and is attached to Fortson's motion as Doc. No. 36-1 pages 13-19. This document is time-stamped as having been filed in Fortson's underlying state court criminal case but was not included by Respondent as part of the habeas record. As Respondent does not dispute that this document is a true and complete copy of Fortson's state court Motion for Discovery, the Court will grant Fortson's motion to expand the record to include this pleading.

The Court will also expand the record to include the documents identified above as Items 1, 3, 4, 5, 6, 7, 9, 10 and 11, as follows. These documents purport to be copies of City of Euclid Police Department investigation notes and interviews. Respondent does not contest that these

30

documents are authentic, official Euclid Police Department documents regarding the Elaine Lovett homicide investigation.  Rather (and to the extent the Court considers Respondent's brief in opposition to Fortson's motion for evidentiary hearing in this context), Respondent argues only that these documents should not be considered in light of the Supreme Court's holding in *Pinholster*.

The Court rejects this argument.  While *Pinholster* prevents this Court from considering extra-record evidence in deciding whether a habeas claim that has been adjudicated on the merits by the state courts satisfies the standard set forth in § 2254(d)(1) and (2), federal courts have found that such evidence may be considered in determining whether a habeas petitioner has met the gateway actual innocence standard set forth in *Schlup v. Delo*, 513 U.S. 298, 316 (1995).  *See e.g., Vinson v. Mackie,* 2016 WL 6595021 at * 1 (E. D. Mich. Nov. 8, 2016) ("While neither the Supreme Court nor the Sixth Circuit have yet resolved the issue, lower courts that have addressed the question have unanimously held that *Pinholster*'s limitation on new evidence does not apply to claims of actual innocence, especially when it is used to excuse a procedural default of another claim.") (collecting cases); *Campbell v. Warden, London Correctional Institution*, 2015 WL 7710761 at * 5 (S.D. Ohio Nov. 30, 2015) ("Campbell argues *Pinholster* does not apply to prevent consideration of new evidence to . . . show actual innocence to excuse a procedural default.  This Court agrees.  *Pinholster* only addresses admission of new evidence on the question to be decided under 28 U.S.C. § 2254(d)(1) and (2)"); *Jackson v. Warden, Lebanon Correctional Inst*., 2014 WL 3899292 at * 3 (S.D. Ohio Aug. 11, 2014) ("Under *Pinholste*r, [the new evidence] cannot be considered in deciding the question presented by 28 U.S.C. § 2254(d)(1), but the Court can consider [it] in determining whether Jackson has met the *Schlup* gateway innocence

31

standard."); *Clemmons v. Warden, Lebanon Correctional Inst.*, 2012 WL 4811122 at * 8 (S.D. Ohio Oct. 10, 2012) ("However, *Pinholster* does not by its own terms apply to the actual innocence exception to either procedural default or the statute of limitations. The premise of the actual innocence exception is that the habeas petitioner is presenting new evidence not considered by the state courts. Nothing in the AEDPA purports to limit what new evidence a petitioner can present on that question." ). *See also Gordon v. Turner*, 2015 WL 3969689 at * 6 (N.D. Ohio June 30, 2015) (in evaluating motion to expand record, court "shall evaluate whether the proposed exhibit is relevant to either the timeliness of the petition or whether Petitioner can demonstrate equitable tolling or actual innocence").

Here, as discussed at length below, Fortson argues that the "actual innocence" exception to AEDPA's statute of limitations applies to the instant Petition. Thus, the Court will expand the record to include Items 1, 3, 4, 5, 6, 7, 9, 10 and 11. However, the Court will only consider these documents for the limited purpose of determining whether Fortson has met the gateway "actual innocence" standard.

The Court will not expand the record to include the document identified above as Item 2. This document is handwritten, undated, and unsigned. There is nothing on the face of this document indicating it is an official record of the Euclid Police Department nor is there any other identifying feature that establishes its reliability or authenticity. The Court, therefore, finds it would not be appropriate to expand the habeas record to include this document.

Accordingly, and for all the reasons set forth above, Fortson's Motion to Expand the Record (Doc. No. 36) is granted as to Items 1, 3, 4, 5, 6, 7, 8, 9, 10 and 11, and denied as to Item 2.

32

## IV.  Statute of Limitations

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

('AEDPA'), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326–27, 337 (1997). The

relevant provisions of AEDPA state:

> (d)(1) A one year period of limitations shall apply to the filing of an application
> for a writ of habeas corpus by a person in custody pursuant to the judgment of a
> State court.  The limitation period shall run from the latest of–
>
>> (A) the date on which the judgment became final by the
>> conclusion of direct review or the expiration of the time for
>> seeking such review;
>>
>> (B) the date on which the impediment to filing an application
>> created by State action in violation of the Constitution or laws of
>> the United States is removed, if the applicant was prevented from
>> filing by such State action;
>>
>> (C) the date on which the constitutional right asserted was
>> initially recognized by the Supreme Court and made retroactively
>> applicable to cases on collateral review; or
>>
>> (D) the date on which the factual predicate of the claim or claims
>> presented could have been discovered through the exercise of due
>> diligence.
>
> (2) The time during which a properly filed application for State post-conviction
> or other collateral review with respect to the pertinent judgment or claim is
> pending shall not be counted toward any period of limitation under this
> subsection.

28 U.S.C. § 2244(d)(1) & (2).

## A.  One–Year Limitation

The AEDPA establishes a general rule that there is a one-year statute of limitations for

filing a habeas petition in federal court for persons in custody pursuant to the judgment of a state

court.  28 U.S.C. § 2244(d)(1).  *See Crangle v. Kelly,* 838 F.3d 673, 677 (6th Cir. 2016).

33

Subsection 2244(d)(1)(A) indicates the limitations period runs from the date on which the state court judgment becomes final by conclusion of direct review or the expiration of the time for seeking such review, whichever is later.  The Sixth Circuit has found that, for petitioners who seek review on direct appeal in the Supreme Court of Ohio, 'the one-year statute of limitations does not begin to run until the time for filing a petition for a writ of *certiorari* for direct review in the United States Supreme Court has expired.' *Bronaugh v. Ohio*, 235 F.3d 280, 282 (6th Cir. 2000).  *See also Weese v. Sloane,* 2016 WL 626494 at * 5 (N.D. Ohio Jan. 21, 2016); *Ajumu v. Goodrich*, 2014 WL 1236268 at * 1 (N.D. Ohio March 24, 2014); *Pimental v. Hudson*, 2008 WL 4186922 at * 1 (N.D. Ohio Sept. 5, 2008).

Here, Fortson was sentenced on June 6, 2000 and timely appealed on July 5, 2000.  (Doc. No. 9-1, Exhs. 10, 11.)  The state appellate court affirmed his conviction and sentence on August 2, 2001.  (Doc. No. 9-1, Exh. 15.)  Fortson thereafter appealed to the Supreme Court of Ohio on September 21, 2001.  (Doc. No. 9-1, Exh. 16.)  The Supreme Court of Ohio declined jurisdiction on December 5, 2001, and Fortson did not file a petition for writ of *certiorari*.  (Doc. No. 9-1, Exh. 19.)  Based on this sequence of events, Respondent argues Fortson's conviction and sentence became "final" for purposes of § 2244(d)(1)(A) on March 5, 2002, ninety (90) days after the Supreme Court of Ohio dismissed his appeal and the time period for seeking a petition for writ of *certiorari* in the United States Supreme Court expired.  (Doc. No. 28 at 25.)  Respondent then asserts the limitations period commenced on March 6, 2002 and, absent tolling or a later start date, would have expired one year later on March 6, 2003.  (*Id*.)

However, as Respondent correctly notes, the AEDPA tolls the one-year limitations period during the time " 'a properly filed application for State postconviction or other collateral review

... is pending.' § 2244(d)(2)." *Evans v. Chavis*, 546 U.S. 189, 191 (2006); *Carey v. Saffold*, 536 U.S. 214 (2002); *accord Matthews v. Abramajtys*, 319 F.3d 780, 787 (6th Cir. 2003).  "The time that an application for state post-conviction review is 'pending' includes the period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, provided that the filing of the notice of appeal is timely under state law."  *Id.*[7]

Only "properly filed" applications for post-conviction relief or collateral review toll the statute of limitations, and "a state post-conviction petition rejected by the state court as untimely is not 'properly filed' within the meaning of § 2244(d)(2)."  *Allen v. Siebert*, 552 U.S. 3, 128 S.Ct. 2, 3 (2007); *Pace v. DiGuglielmo*, 544 U.S. 408, 125 S.Ct. 1807 (2005) ("time limits, no matter their form, are 'filing' conditions, and a state postconviction petition is therefore not 'properly filed' if it was rejected by the state court as untimely"); *Monroe v. Jackson*, 2009 WL 73905 at *2 (S.D. Ohio Jan. 8, 2009).  A timely filed state post-conviction matter, however, cannot serve to toll a statute of limitations which has already expired before the motion was filed.  *See Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003).  Section 2244(d)(2)'s tolling provision "does not ... 'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run.  Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations."  *Vroman*, 346 F.3d at 602 (citation omitted).  Further, if a state court ultimately denies a petition as untimely, that petition was neither properly filed nor pending and a petitioner would not be entitled to statutory tolling.  *See Monroe,* 2009 WL 73905

---

[7]  An application for state habeas review is an application for state post-conviction review or other collateral review within the meaning of the AEDPA.  *See Abela v. Martin*, 348 F.3d 164, 170 (6th Cir. 2003), *overruled on other grounds as stated in Sanders v. Bobby*, 2008 WL 276415 (N.D. Ohio Jan. 31, 2008).

at *2; *Thorson v. Palmer*, 479 F.3d 643, 645 (9th Cir. 2007).

Here, Respondent argues there are no "properly filed applications for state post-conviction or collateral review" between the commencement of the limitations period on March 6, 2002 and its expiration on March 6, 2003.  Specifically, Respondent argues Fortson's first federal petition for writ of habeas corpus, filed on August 9, 2002, does not toll the limitations period because it does not constitute an "application for state post-conviction or other collateral review" for purposes of § 2244(d)(2).  Respondent then maintains the limitations period was not tolled by Fortson's November 4, 2002 Delayed Motion for New Trial under Ohio Crim. R. 33 because that motion was denied as untimely and, therefore, cannot be considered a "properly filed" application for state collateral review.  Fortson fails to address either of these arguments in either his Traverse (Doc. No. 37) or "Traverse Amendment" (Doc. No. 39.)

The Court agrees with Respondent.  The limitations period was not tolled by Fortson's August 2002 federal habeas petition because that petition did not constitute a state collateral review petition within the meaning of § 2244(d)(2) as a matter of law.  *See Duncan v. Walker*, 533 U.S. 167, 181-182 (2001).  *See also Thomas v. Romanowski*, 362 Fed. Appx. 452, 454 (6th Cir. 2010) ("Although AEDPA's time limit does not run while 'a properly filed application for State post-conviction' relief is pending, 28 U.S.C. § 2244(d)(2), it *does* run while the federal courts consider applications for habeas review") (emphasis in original); *Martin v. Warden, Correctional Reception Center*, 2015 WL 8773470 at * 5 (S.D. Ohio Dec. 14, 2015) (noting that "the limitations period was not tolled while the [petitioner's first federal habeas] petition was pending before this Court because the pleading did not constitute a *state* collateral review petition within the meaning of § 2244(d)(2).") (emphasis in original); *Anderson v. Warden*, 2010 WL

36

1387504 at * 4 (N.D. Ohio March 9, 2010).

Moreover, the Court agrees with Respondent that Fortson's post-appellate motion for new trial under Ohio Crim. R. 33 constitutes a state post-conviction proceeding for purposes of § 2244(d)(2) and, therefore, does not toll the running of the period of limitation unless it is "properly filed."[8]  *See Anderson v. Warden*, 2010 WL 1387504 at * 3 (N.D. Ohio March 9, 2010). Here, the state trial court denied Fortson's motion because it was filed outside the one hundred twenty (120) day window for filing such motions and, further, because Fortson failed to present evidence demonstrating he was unavoidably prevented from discovering his new evidence.[9] (Doc. No. 9-2, Exh. 34.)  The state appellate court affirmed.  (Doc. No. 9-2, Exh. 37.)

Because Fortson's motion was denied as untimely, the Court finds it was not "properly filed" for purposes of § 2244(d)(2).  As the Supreme Court has explained, an application is "properly filed" when its delivery and acceptance by the state court comply with state laws and rules governing filings.  *See Artuz v. Bennett*, 531 U.S. 4, 8 (2000); *Pace v. DiGuglielmo*, 544

---

[8] With respect to motions for new trial under Ohio Criminal Rule 33, the Sixth Circuit has held "that when a state defendant files a motion for new trial before filing a direct appeal, and when the denial of that motion is then consolidated with and reviewed during the direct appeal, the motion for new trial is part of the original criminal proceedings and is not a collateral proceeding."  *Pudelski v. Wilson,* 576 F.3d 595, 610 (6th Cir. 2009).  Fortson's direct appeal had been filed and concluded by December 2001, and his first  motion for new trial was not filed with the trial court until November 2002.  Thus, pursuant to *Pudelski*, Fortson's post-appellate motion for new trial was a part of the state's collateral review process.

[9] In the alternative, the state trial court found that, "even if [Fortson] had demonstrated that he was unavoidably prevented from discovering the evidence he now possesses, this alleged new evidence does not lead the Court to believe that there would be a strong probability of altering the trial's outcome." (Doc. No. 9-2, Exh. 34.)  In the same paragraph, however, the trial court emphasized that "Defendant's motion is denied on the grounds that he did not file his motion within the one hundred twenty day window."  (*Id*. at Page ID# 831.)  Thus, the court made clear that Fortson's motion was denied was untimely.

U.S. 408, 414-17 (2005); *Allen v. Siebert*, 552 U.S. 3,7 (2007). *See also Vroman v. Brigano*, 346 F.3d 598, 603 (6th Cir. 2003). Such requirements generally pertain to the form of the document, the time limits for its delivery, the appropriate filing court, or the filing fee. *Artuz*, 531 U.S. at 8. The state courts are the arbiters of the state's time rules. *See Vroman*, 346 F.3d at 603; *Israfil v. Russell*, 276 F.3d 768, 771 (6th Cir. 2001). Consequently, "[w]hen a postconviction petition is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)." *Allen v. Siebert*, 552 U.S. at 7 (quoting *Pace*, 544 U.S., at 414 (quoting *Carey v. Saffold*, 536 U.S., 214, 226 (2002) (alteration in original)). As noted above, the state court found Fortson had failed to either comply with the one hundred twenty (120) day filing requirement or establish why he was unavoidably prevented from discovering his new evidence. Accordingly, his motion was denied as untimely under Ohio Crim. Rule 33 and was not "properly filed" for AEDPA statutory tolling purposes. *See e.g., Smith v. Smith*, 2009 WL 6337960 at * 12 (N.D. Ohio Sept. 24, 2009) ("Since Petitioner's motions were based upon evidence that was available or could have been discovered at the time of trial, he could have complied with the 120 day filing requirement. However, he failed to do so; therefore, his motions did not comply with the procedural requirements of Rule 33 and were not properly filed for AEDPA tolling purposes.").

Thus, the statute of limitations commenced on March 6, 2002 and ran uninterrupted until it expired on March 6, 2003. Although Fortson filed many collateral actions after March 6, 2003 (including his five state habeas petitions, two post-conviction petitions, and second delayed motion for new trial), none of these pleadings provide statutory tolling.[10] This is because Section

---

[10] Additionally, Fortson's 26(B) Application does not provide statutory tolling under the circumstances presented. That Application was filed on November 27, 2001 and denied by the state appellate court on December 11, 2001. (Doc. No. 9-1, Exhs. 20, 22.) Fortson later

2244(d)(2)'s tolling provision "does not ... 'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run.  Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations."  *Vroman*, 346 F.3d at 602 (citation omitted).

Having found this, however, even if the Court were to consider Fortson's November 2002 motion for new trial and subsequent post-conviction filings as set forth below as "properly filed," the instant habeas petition would still be untimely.  Specifically, assuming *arguendo* the statute of limitations was tolled throughout the pendency of Fortson's November 2002 motion for new trial, five state habeas petitions, December 2003 state post-conviction petition, and all related appeals, these collateral actions would only have tolled the limitations period until May 24, 2006.[11]  The statute of limitations would then have begun to run on May 25, 2006 and would have run

--------

filed a motion for reconsideration on January 23, 2002, which was denied on February 6, 2002.  (Doc. No. 9-1, Exhs. 23, 25.)  He did not seek further review in the Supreme Court of Ohio.  Thus, Fortson's 26(B) Application was resolved prior to the commencement of the statute of limitations period on March 6, 2002.

[11] As set forth *supra*, the state trial court denied Fortson's motion for new trial on February 6, 2003, Fortson timely appealed, and the state appellate court affirmed on October 9, 2003.  (Doc. No. 9-2, Exhs. 34, 35, 37.)  Fortson then filed a motion for reconsideration which was denied by the state appellate court on October 31, 2003.  (Doc. No. 9-2, Exhs. 38, 39.)  In the meantime, Fortson filed his first state habeas petition on October 3, 2003, which was denied by the Ninth District Appellate Court on December 9, 2003.  (Doc. No. 9-3, Exh. 40, 42.)  Fortson appealed, and the Ohio Supreme Court affirmed on April 28, 2004.  (Doc. No. 9-3, Exh. 44; Doc. No. 9-6, Exh. 110.)  Meanwhile, on December 2, 2003, Fortson filed his first state post-conviction petition in state trial court, which was denied on July 15, 2004.  (Doc. No. 9-4, Exhs. 62, 64.)  Fortson appealed, and the state appellate court affirmed on May 19, 2005.  (Doc. No. 9-4, Exhs. 70; Doc. No. 9-5, Exh. 75.)  Fortson appealed to the Ohio Supreme Court, which declined jurisdiction on September 7, 2005.  (Doc. No. 9-5, Exhs. 77, 78.)  That same month, Fortson filed a state habeas petition in the Fifth District Appellate Court, which was dismissed on November 8, 2005.  (Doc. No. 9-4, Exhs. 52, 56.)  Fortson appealed, and the Ohio Supreme Court affirmed on May 24, 2006.  (Doc. No. 9-4, Exhs. 57, 60, 61.)

39

interrupted until it expired on May 25, 2007.  Fortson did not file the instant habeas petition until

September 29, 2015.  (Doc. No. 1.)  Thus, even tolling the statute of limitations for all of the

above-mentioned post-conviction filings, Fortson's habeas petition would still be over seven (7)

years late.[12]  Therefore, unless equitable tolling is appropriate or Fortson is entitled to begin

calculating the statute of limitations from an alternative date, his petition should be dismissed as

time-barred.

**B.      Factual Predicate**

Pursuant to 28 U.S.C. § 2244(d)(1)(D), the statute of limitations may commence later than

the date when a petitioner's conviction became final if "the factual predicate of the claim or

claims presented" was not discovered by a petitioner, acting with due diligence, until a later date.

Fortson claims that: "With respect to Grounds 5-6, Petitioner relies on 28 U.S.C. §

2244(d)(1)(D) as the reason the one year statute of limitations does not bar his petition.  The

petition is being presented within the one year period from the date on which the factual predicate

of the claim or claims could have been discovered."  (Doc. No. 1 at 37.)  Fortson then argues he

meets the requirements of § 2244(d)(1)(D) because he exercised due diligence in discovering the

factual predicate of Grounds Five and Six.

As noted above, Grounds Five and Six of the instant petition raise claims under *Brady v.*

*Maryland*, 373 U.S. 83 (1963) regarding statements and notes from the initial 1978 police

investigation relating to four witnesses:  Ann Coulter, Archie Jones, Ronald Harris, Havannia

---

[12] Although Fortson filed a second post-conviction petition in December 2007 and his second
motion for new trial in September 2013, neither of these pleadings would toll the limitations
period because it would have already expired as of May 25, 2007.  As noted above, "[o]nce
the limitations period is expired, collateral petitions can no longer serve to avoid a statute
of limitations."  *Vroman*, 346 F.3d at 602.

Fails, and Curtis Melton.  (Doc. No. 1.)  In his petition, Fortson argues these statements/notes

impeach the testimony of state witness Jackie Conners; corroborate Fortson's own statement

given to police in 1978; demonstrate that another individual (Archie Jones) was the victim's pimp

and had recently beaten her; and implicate Jones in the victim's murder.  Fortson claims defense

counsel requested these documents in pre-trial discovery, but they were not disclosed by the State

either before or during trial.  He asserts he did not obtain these documents until "late 2012"

through a public records request.  (Doc. No. 4-7 at Page ID #139; Doc. No. 9-5, Exhs. 87, 88.)

Fortson then argues that "[t]his Court should not fault Petitioner for failing to scavenge for

evidence of undisclosed *Brady* evidence and find that he did exercise due diligence when he

already repeatedly asked for disclosure and the evidence was unconstitutionally withheld by the

government."  (Doc. No. 37 at 148.)

　　　　Respondent asserts the statements and notes at issue were exempt from discovery at the

time of Fortson's trial and, therefore, the State did not unlawfully withhold them.  (Doc. No. 28 at

33-34.)  *See also* Doc. No. 9-6, Exh. 93.  He argues these records "were not available as public

records until H.B. 9 was passed, state legislation effective March of 2007."  (Doc. No. 28 at 34.)

Respondent then argues Fortson cannot avail himself of a later start date under §2244(d)(1)(D)

because Fortson concedes he received the statements/notes at issue in "late 2012" but "failed to

file the instant habeas petition even within one year of the last day of 2012."  (Doc. No. 28 at 26.)

Respondent further asserts Fortson "has produced no explanation for the delay in filing his habeas

petition for some three years later," in September 2015.  (*Id.*)

　　　　For the following reasons, the Court finds that, with respect to Grounds Five and Six,

Fortson's petition is untimely even assuming a later start date under the factual predicate

41

provision set forth in § 2244(d)(1)(D).   For purposes of this Report & Recommendation only, the Court will accept Fortson's assertion that the documents underlying Grounds Five and Six (i.e., the statements and notes from the initial 1978 police investigation relating to Ann Coulter, Archie Jones, Ronald Harris, Havannia Fails, and Curtis Melton) constitute *Brady* material.[13]  The Court further accepts Fortson's statement that he did not receive these documents until "late 2012."

As such, the Court further assumes the factual predicate of Grounds Five and Six of the instant petition were not discovered by Fortson until, at the very latest, December 31, 2012.  *See Willis v. Jones*, 329 Fed. Appx. 7, 8 (6th Cir. 2009) (finding that, under § 2244(d)(1)(D), the one year period for filing habeas petition did not begin to run until the date the petitioner discovered the State had failed to disclose impeachment evidence); *Bates v. Warden, Southern Ohio Correctional Institution*, 2013 WL 1455317 at * 3 (S.D. Ohio April 9, 2013) ("It is often the case that establishment of the one-year period of limitations under 28 U.S.C. § 2244(d)(1)(D), when based on the factual predicate of misrepresentation, runs from the date that a habeas petitioner gains actual knowledge of the misrepresentation.").  Thus, the one-year limitation period would have commenced the next day, on January 1, 2013.

Fortson, however, then waited over nine months, until September 20, 2013, to file his delayed motion for leave to file motion for new trial and motion for new trial relating to this alleged *Brady* material.  The limitations period would have run for a total of 262 days during this time period (i.e., from January 1, 2013 to September 20, 2013).  This would have left 103 days

---

[13] To establish a *Brady* violation, a habeas petitioner must establish three elements: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.  *Brooks v. Tennessee*, 626 F.3d 878, 890 (6th Cir. 2010) (citing *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999)).

remaining for Fortson to timely file his habeas petition.  However, as noted above, the AEDPA

tolls the one-year limitations period during the time " 'a properly filed application for State

postconviction or other collateral review ... is pending.' § 2244(d)(2)."  *Evans*, 546 U.S. at 191;

*Matthews*, 319 F.3d at 787.[14]

As noted above, Fortson filed his second motion for delayed leave to file motion for new

trial and delayed motion for new trial on September 20, 2013.  (Doc. No. 9-5, Exhs. 87, 88.)  The

trial court summarily denied the motion for leave on November 5, 2013, and the state appellate

court affirmed that decision on August 28, 2014.  (Doc. No. 9-5, 89; Doc. No. 9-6, Exhs. 90, 95.)

Fortson thereafter filed a motion for reconsideration on September 15, 2014, which the state

appellate court denied.  (Doc. No. 9-6, Exhs. 96, 97.)  He then filed a delayed notice of appeal and

memorandum in support of jurisdiction in the Supreme Court of Ohio, which was denied on

December 24, 2014.  (Doc. No. 9-6, Exhs. 101, 102.)  Giving Fortson every possible benefit, the

Court will assume the statute of limitations was tolled throughout the pendency of Fortson's these

unsuccessful state court proceedings; i.e., from September 20, 2013 until December 24, 2014.

The limitations period would have commenced to run again on December 25, 2014, and

run for 103 days until it expired on April 7, 2015.  Fortson did not file his habeas petition in this

Court until September 29, 2015, over five months later.  Accordingly, even assuming Fortson did

---

[14] Respondent appears to assert that statutory tolling is not available in a "factual predicate" analysis, arguing that Grounds Five and Six are untimely because "Fortson failed to file the instant habeas petition even within one year of the last day of 2012."  (Doc. No. 28 at 26.) Respondent cites no authority for this position.  To the contrary, federal courts have applied statutory tolling principles when examining whether a petition is time barred under the factual predicate provision set forth in § 2244(d)(1)(D).  *See e.g., Bates*, 2013 WL 1455317 at fn 3; *Willis*, 329 Fed. Appx. 7 (finding petition timely filed when petitioner discovered *Brady* material in June 1998, sought collateral relief in state court from April 1999 until May 29, 2002, and filed habeas petition on June 12, 2002).

not discover the factual predicate of Grounds Five and Six until December 31, 2012 and assuming further that the limitations period was statutorily tolled throughout the pendency of his September 2013 motion for leave to file delayed motion for new trial and delayed motion for new trial, Grounds Five and Six would nevertheless be barred by the statute of limitations.

**C.      State-Created Impediment**

Pursuant to Section 2244(d)(1)(B), a statute of limitations may commence later than the date when a petitioner's conviction becomes final if "an impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action."

Here, Fortson argues the State's allegedly unlawful withholding of the statements and notes from the initial 1978 police investigation relating to Ann Coulter, Archie Jones, Ronald Harris, Havannia Fails, and Curtis Melton constitutes a state-created impediment  under § 2244(d)(1)(B).  (Doc. No. 37 at 155-156.)  He argues he is entitled to equitable tolling on this basis, apparently until "late 2012" when he received the documents in question through a public records request.

As an initial matter, Fortson is not entitled to equitable tolling on this basis.  Section 2244(d)(1)(B) provides for a later start date of the limitations period, and is separate and distinct from the concept of equitable tolling which will be discussed below.  To the extent Fortson's argument is construed to assert that the limitations period should not commence until the alleged state-created impediment was removed in "late 2012," the petition would nonetheless be untimely for all the reasons discussed above in connection with Fortson's factual predicate argument.

Accordingly, the Court finds the instant Petition (including Grounds Five and Six) is

44

untimely and should be dismissed as time-barred, unless Fortson can establish equitable tolling or the applicability of the actual innocence exception.[15]

### D.    Equitable Tolling

Although the Petition herein is untimely, the AEDPA statute of limitations period is also subject to equitable tolling.  *See Holland v. Florida,* 560 U.S. 631, 130 S.Ct. 2549, 2560, 177 L.Ed.2d 130 (2010).  Equitable tolling "allows courts to toll a statute of limitations when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control."  *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010).  *See also Hall v. Warden, Lebanon Correctional Institution*, 662 F.3d 745, 749 (6th Cir. 2011).  However, the equitable tolling doctrine is granted by courts only "sparingly."  *See Robertson*, 624 F.3d at 784.  Moreover, "although 'the party asserting statute of limitations as an affirmative defense has the burden of demonstrating that the statute has run,' the petitioner bears the ultimate burden of persuading the court that he or she is entitled to equitable tolling."  *Ata v. Scutt*, 662 F.3d 736, 741 (6th Cir. 2011)(quoting *Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002)).

In order to be entitled to equitable tolling, a habeas petitioner must establish that (1) he has been pursuing his rights diligently; and, (2) some extraordinary circumstance stood in his way and prevented timely filing.  *Holland*, 130 S.Ct. at 2565.  *See also Hall*, 662 F.3d at 749; *Griffin*, 308 F.3d at 653.  "The diligence required for equitable tolling purposes is reasonable diligence, not maximum diligence."  *Holland*, 130 S.Ct. at 2565.  That being said, the Sixth Circuit has held that excessive delays in filing lack appropriate diligence.  *See e.g. Keeling v. Warden*, 673 F.3d

---

[15]  Fortson does not argue the limitations period should commence at a later date because a constitutional right asserted in the Petition was newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review.  *See* § 2244(d)(1)(C).

45

452, 463–64 (6th Cir. 2012); *Vroman v. Brigano*, 346 F.3d 598, 605 (6th Cir.2003)(stating that a court should be "much less forgiving ... where the claimant failed to exercise due diligence in preserving his legal rights").

Respondent argues Fortson is not entitled to equitable tolling.  Respondent first maintains the instant petition does not "relate back" to Fortson's August 2002 federal habeas petition for purposes of § 2244(d)(1).  He then argues Fortson is not entitled to an administrative stay of his prior petition because Fortson (1) did not seek to stay his prior petition; (2) did not assert any unexhausted claims in his prior petition; and (3) was not diligent in returning to federal court after the dismissal of his prior petition.  (Doc. No. 28 at 29-31.)

Finally, Respondent argues generally that "Fortson has been dilatory, rather than diligent, in pursuit of his claims before both the state and federal courts."  (*Id*. at 32.)  Specifically, he argues Fortson "failed to return to federal habeas within 13 years of exhausting his 2002 affidavit claims" and "failed to file his petition within one year of the 2012 date he concedes he was aware of the 1978 police investigation records he asserts underlie his Fifth and Sixth habeas grounds." (*Id.*)  Respondent maintains "Fortson has asserted no reasonable circumstances outside of his control explaining why he failed to raise his instant grounds in a timely filed petition as he must in order to receive equitable tolling consideration under *Holland*, 560 U.S. at 649, and *Pace*, 544 U.S. at 418."  (*Id*.)

Fortson does not argue the instant petition "relates back" to his prior petition, or that the Court should consider his prior petition as having been administratively stayed.  Nonetheless, the Court agrees with Respondent that neither of these avenues are available to Fortson.  Federal courts have found the "relation back" doctrine does not apply under the circumstances presented.

46

*See, e.g., Williams v. Smith*, 2015 WL 7571824 at * 2 (N.D. Ohio Nov. 24, 2015); *Hinds v. McLemore*, 2006 WL 1795137 at *1 (W.D. Mich. June 28, 2006) (citing cases).  Here, Fortson filed his first federal habeas petition in this Court on August 9, 2002 in Case No. 1:02CV1575, raising five grounds for relief.  After the filing of the Return and Traverse, Fortson moved to withdraw that petition "in order for Petitioner to exhaust State claims that are now pending in the State Court, pursuant to Criminal Rule 33(B), New Trial Motion."  *Fortson v. Thomas*, Case No. 1:02CV1575 (N.D. Ohio) (Doc. No. 21.)  The Court (through District Judge Kathleen O'Malley) granted Fortson's unopposed motion to withdraw without prejudice on April 21, 2003 and dismissed the case.  (Doc. No. 9-2, Exh. 30.)  Thereafter, over twelve years later, Fortson filed the instant habeas petition in this Court on September 29, 2015, raising seven grounds for relief. (Doc. No. 1.)

The instant habeas petition is an entirely new petition and, for purposes of the statute of limitations under § 2244(d)(1), does not "relate back" to Fortson's first petition that was previously dismissed without prejudice in Case No. 1:02CV1575.  As another federal court within this Circuit has observed, "[t]he relation back doctrine and Fed. R. Civ. P. 15(c) do not apply because [the] previous habeas petition was dismissed and there is no existing pleading/habeas petition pending before the Court to which the instant second habeas petition . . . could relate back."  *Hinds*, 2006 WL 1795137 at *1.  Accordingly, Fortson cannot avoid the untimeliness of the instant petition through the "relation back" doctrine.

The Court also agrees with Respondent that Fortson is not entitled to equitable tolling on the grounds Fortson's first petition should be viewed as having been administratively stayed.  In *Rhines v. Weber*, 544 U.S. 269 (2005), the United States Supreme Court determined that stay and

47

abeyance of a "mixed" habeas petition (i.e., a petition containing both exhausted and unexhausted claims) is appropriate only where the petitioner can show: (1) good cause for his failure to exhaust; (2) that his unexhausted claims are not "plainly meritless;" and (3) that there is no indication that the petitioner engaged in "intentionally dilatory litigation tactics." *Rhines,* 544 U.S. at 277-78. *See also Wagner v. Smith*, 581 F.3d 410, 419 (6th Cir. 2009). Here, Fortson did not request that the Court stay and abey his first habeas petition, which was filed on August 9, 2002 in Case No. 1:02CV1575. (Doc. No. 9-1, Exh. 26.) Rather, on March 13, 2003, Fortson requested the Court dismiss the petition without prejudice in order to allow him to exhaust claims "that are now pending in the State Court, pursuant to Criminal Rule 33(B), New Trial Motion." (Doc. No. 9-2, Exh. 29.) This motion was granted by District Judge O'Malley on April 21, 2003. (Doc. No. 9-2, Exh. 30.) Fortson did not request, and was not granted, a stay of his first habeas petition. Further, he does not presently argue that the Court should have stayed, instead of dismissed, his first petition. Thus, the Court finds Fortson cannot avoid the untimeliness of the instant petition on this basis.[16]

---

[16] Moreover, even if Fortson had requested a stay, the Court notes he did not timely return to federal court after exhausting his claims in state court. It appears from Fortson's motion to withdraw that Fortson sought dismissal of his first habeas petition in order to pursue an appeal from the state trial court's denial of his November 2002 motion for new trial. This motion for new trial was based on "newly discovered evidence" in the form of affidavits from various individuals including Robert Caver, Brenda Caver, Andee Caver, and Glenda Anderson. (Doc. No. 9-2, Exh. 32.) The state appellate court affirmed the trial court's denial of Fortson's motion for new trial on October 9, 2003. (Doc. No. 9-2, Exh. 37.) Fortson did not return to federal court to pursue habeas relief relating to the claims raised in this motion for trial until nearly *twelve years later* in September 2015. Thus, even if Fortson had requested and been granted a stay, his failure to return to federal court for nearly twelve years demonstrates a lack of diligence and falls well outside of the general requirement that petitioners return within a "reasonable" time to litigate their habeas claims. *See Rhines,* 544 U.S. at 278; *Palmer v. Carlton*, 276 F.3d 777, 781 (6th Cir. 2002) (affirming dismissal of petition where petitioner waited over two months before coming back to federal court after

Finally, the Court finds Fortson is not entitled to equitable tolling because he has not demonstrated he has pursued his rights diligently or that some "extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 130 S.Ct. at 2562. *See also Keeling*, 673 F.3d at 462. As discussed above, even after receiving the alleged *Brady* material that forms the basis of Grounds Five and Six in "late 2012," Fortson waited, at a minimum, nearly ten (10) months (until September 20, 2013) to file his second motion for leave to file delayed motion for new trial and delayed motion for new trial in state trial court. His appeals from the denial of that motion were exhausted on December 24, 2014 when the Ohio Supreme Court denied his delayed notice of appeal. (Doc. No. 9-6, Exhs. 101, 102.) Yet, Fortson waited another ten (10) months (until September 29, 2015) to file the instant habeas petition.

Based on this sequence of events, the Court finds Fortson failed to exercise sufficient diligence or otherwise demonstrate extraordinary circumstances to warrant the application of equitable tolling.[17] *See e.g., Anderson v. Brunsman*, 562 Fed. Appx. 426, 431 (6th Cir. April 20, 2014) (finding petitioner was not entitled to equitable tolling or otherwise demonstrated extraordinary circumstances to warrant the application of equitable tolling where he waited more than 45 days to file a motion for delayed appeal after receiving a copy of the state appellate court decision, and then waited more than six months to file habeas petition after the denial of his

---

exhausting his claim, as this amounted to more than the "normal" 30 day period for returning to federal court).

[17] To the extent Fortson suggests equitable tolling is warranted based on his *pro se* status, the Court rejects this argument. The Sixth Circuit has found that a habeas petitioner's *pro se* status and lack of knowledge of the law do not constitute an extraordinary circumstance warranting equitable tolling of the AEDPA statute of limitations. *See Keeling*, 673 F.3d at 464; *Hall v. Warden, Lebanon Correctional Inst.*, 662 F.3d 745, 751-752 (6th Cir. 2011).

delayed appeal).

Accordingly, Fortson is not entitled to equitable tolling of the one-year statute of limitations.

**E.    Actual Innocence**

In *McQuiggan v. Perkins*, ––– U.S. ––––, 133 S.Ct. 1924, 1928, 185 L.Ed.2d 1019 (2013), the United States Supreme Court held that actual innocence, if proved, may overcome the expiration of AEDPA's one-year statute of limitations.  The Court noted that a claim of actual innocence is not a request for equitable tolling but, rather, a request for an equitable exception to § 2244(d)(1).  *Id.* at 1931.

For the actual innocence exception to apply, a petitioner must "support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).  The Supreme Court explained, however, that "tenable actual-innocence gateway pleas are rare" and "'[a] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  *McQuiggan*, 133 S.Ct. at 1928 (quoting *Schlup*, 513 U.S. at 329).  In making this assessment, "'the timing of the [petition]' is a factor bearing on the 'reliability of th[e] evidence' purporting to show actual innocence."  *Id.* (quoting *Schlup*, 513 U.S. at 332).

In evaluating a claim of actual innocence, "[t]he touchstone of the inquiry is whether a petitioner's 'new evidence shows 'it is more likely than not that no reasonable juror would have convicted [him].'"  *Eberle v. Warden, Mansfield Correctional Inst.*, 532 Fed. Appx. 605, 612 (6th

Cir. Aug. 8, 2013) (quoting *McQuiggan*, 133 S.Ct. at 1933.)  To assess that question, a court must survey "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell,* 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (internal quotation marks omitted). With "all the evidence" thus in mind, the court's final task is "to assess the likely impact of the evidence on reasonable jurors;" it is not to work through an "independent factual determination" to divine "what likely occurred."  *Id.* (internal quotation marks omitted).  *See Eberle*, 532 Fed. Appx. at 612.

Because a gateway actual innocence claim is a form of equitable tolling, it is a remedy that is granted sparingly.  *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005).  The Supreme Court has repeatedly counseled that actual innocence is an exception that is rarely granted, and only in the most extraordinary circumstances.  *See Schlup*, 513 U.S. at 324 (reasoning that, because new reliable evidence will be unavailable "in the vast majority of cases, claims of actual innocence are rarely successful"); *see also McQuiggin*, 133 S.Ct. at 1928 ("We caution, however, that tenable actual-innocence gateway pleas are rare."); *House*, 547 U.S. at 538 ("The *Schlup* standard is demanding and permits review only in the 'extraordinary' case.").

Here, Fortson argues he has new reliable evidence to establish the actual innocence exception to AEDPA's statute of limitations.  He again emphasizes there was no physical evidence tying him to the scene of the crime and the State's case rested primarily on the testimony of State's witnesses Jacque Conners (aka Tina Hiemer) and Jackie Lynn (aka Ann Coulter).  Forston argues the 1978 police investigation records (that were allegedly withheld by the State and not obtained by Fortson until late 2012) impeach these witnesses' testimony

51

regarding the alleged timeline and motive for Ms. Lovett's murder; corroborate Fortson's own

statement given to police in 1978; demonstrate another individual (Archie Jones) was Ms.

Lovett's pimp and had recently beaten her; and implicate Jones in her murder.  In this regard,

Fortson relies on the following documents, all of which were attached to his Second Motion for

Leave to File Delayed Motion for New Trial filed in September 2013:

- Euclid Police Department Supplementary Report; Ann Marie Coulter statement dated June 2, 1978 (Doc. No. 9-5 at Exh. 87, Page ID#s 1825-1835.)

- Euclid Police Department Report re Archie Jones, Jr dated December 14, 1983 (Doc. No. 9-5 at Exh. 87, Page ID#s 1838-1839.)

- Euclid Police Department Supplementary Report re interview of Ronald Harris dated June 2, 1978 (Doc. No. 9-5 at Exh. 87, Page ID# 1841.)

- Euclid Police Department Report re interview of Havannia Fails dated June 5, 1978 (Doc. No. 9-5 at Exh. 87, Page ID#s 1843-1847.)

- Euclid Police Department Supplementary Report re interview of Curtis Melton dated June 19, 1978 (Doc. No. 9-5 at Exh. 87, Page ID#s 1849-1850.)

- Transcribed Interview of Jackie Conners on May 26, 1986 by Detective Pat Smith (Doc. No. 9-5 at Exh. 87, Page ID#s 1852-1864.)

*See* Doc. No. 37.

Fortson also relies on the recantation affidavits of Andee and Brenda Caver (both of

whom testified at his trial) as well as other documents submitted in support of his First Delayed

Motion for New Trial filed in November 2002 and Petition for Post-Conviction Relief filed in

December 2007.  These documents consist of the following:

- Affidavit of Robert Caver dated September 16, 2002 (Doc. No. 9-2 at Exh. 31, Page ID# 669.)

- Affidavits of Andee Latrice Caver dated December 29, 2001 and June 25, 2002

(Doc. No. 9-2 at Exh. 31, Page ID#s 671-672; Doc. No. 9-5 at Exh. 79, Page ID#s 1722-1723)

- Affidavits of Brenda Caver dated September 12, 2001 and June 26, 2002. (Doc. No. 9-2 at Exh. 31, Page ID# 673; Doc. No. 9-5 at Exh. 79, Page ID# 1724.)

- Affidavit of Glenda Anderson dated June 24, 2002 (Doc. No. 9-2 at Exh. 31, Page ID# 674.)

- Affidavit of Angela Isom dated September 28, 2001.  (Doc. No. 9-2 at Exh. 31, Page ID# 703.)

- Affidavit of Havannia Wade aka Candy dated March 27, 2002. (Doc. No. 9-2 at Exh. 31, Page ID# 708.)

- Interview notes of Robbie Robertson dated May 4, 1999. (Doc. No. 9-2 at Exh. 31, Page ID# 719-720.)

- Affidavit of Robbie Robertson dated October 8, 2001. (Doc. No. 9-2 at Exh. 31, Page ID# 721.)

- Affidavit of Sadie Scott dated September 14, 2001. (Doc. No. 9-2 at Exh. 31, Page ID# 725.)

- Affidavit of Havannia Wade aka Candy dated September 22, 2001. (Doc. No. 9-2 at Exh. 31, Page ID# 727.)

Fortson argues that, taken as a whole, the above documents establish that he is actually innocent of Elaine Lovett's murder.[18]  (Doc. Nos. 37, 39.)

Respondent asserts the above evidence is neither new or reliable.  He challenges Fortson's reliance on the above 1978 police investigation records on the basis that they are either not "new" or not sufficiently convincing such that no reasonable juror would have convicted him had they been presented at trial.  As to Brenda and Andee Cavers' recantation affidavits, Respondent argues these affidavits (obtained in 2001 and 2002) are neither new nor reliable evidence of

---

[18] Fortson also appears to rely on at least some of the documents attached to his Motion to Expand, discussed *supra*.

53

Fortson's innocence.  In this regard, Respondent asserts the state courts reasonably discounted this evidence on the grounds that (1) the jury was already well aware of Brenda and Andee's reluctance to testify; and (2) the familial relationship between Brenda and Andee Cavers and Fortson and their delay in recanting rendered the affidavits unconvincing.  (Doc. No.  28.)

The Court discusses the evidence and parties' arguments in more detail, below.

### 1.    Impeachment Evidence regarding Timeline, Motive, and Archie Jones

Fortson argues the 1978 Police Investigation Records impeach the testimony of State's witnesses Jackie Lynn (aka Ann Coulter) and Jacque Conners (aka Tina Hiemer) regarding the timeline and motive for Ms. Lovett's murder.  He further asserts these records establish that another individual, Archie Jones, was Ms. Lovett's pimp at the time of her death and had recently beaten her in front of the Biscayne Bar.

The Court first discusses, in some detail, the evidence presented at Fortson's trial.  The Court will then recount the allegedly "new and reliable" evidence contained in the 1978 Police Investigation Records and other documents relied upon by Fortson herein.

### a.    Testimony and evidence introduced at trial

At trial, Ms. Lynn/Coulter testified that, in June 1978, she and Ms. Lovett (aka "Little Bit") worked as prostitutes on Euclid Avenue in Cleveland.  (Doc. No. 42-2 at Tr. 362.)  At that time, Fortson (aka Andy Tolliver) was Ms. Lovett's pimp.  (*Id.* at Tr. 363.)  Ms. Lynn/Coulter testified generally about what it was like to be a prostitute during this time period.  (*Id.* at Tr. 357-364, 392.)  Of particular relevance, she stated that, if a prostitute decided to "switch pimps without permission," she would be "terribly, terribly beat up."  (*Id.* at Tr. 364.)  Ms. Lynn/Coulter stated she had seen Fortson beat up Ms. Lovett on at least one occasion, noting Ms. Lovett was a

54

"bloody mess."  (*Id.* at Tr. 364-365, 382.)  Ms. Lynn/Coulter stated this particular incident

occurred "right in front of the Biscayne, on 40th and Euclid."  (*Id.* at Tr. 382.)

Ms. Lynn/Coulter testified that, on June 2, 1978, she became concerned because she had

not seen or heard from Ms. Lovett in "a couple of days."  (*Id.* at Tr. 367.)  She looked for Ms.

Lovett but could not find her.  (*Id.* at Tr. 368.)  She saw Fortson on the street and suggested they

go to Ms. Lovett's apartment to check on her.  (*Id.* at Tr. 368-369.)  Fortson and Ms.

Lynn/Coulter proceeded to Ms. Lovett's apartment, but were unable to enter as the door was

locked.  (*Id.* at Tr. 369- 370.)  The superintendent called the police.  (*Id.*)  When the police

arrived, they (police) entered Ms.  Lovett's apartment and found her dead body.  (*Id.* at Tr.

370.)

Euclid Police Detective Patrick Newkirk testified he arrived at the crime scene at

approximately 6:00 p.m. on Friday, June 2, 1978.[19]  (Doc. No. 42-2 at Tr. 437.)  He stated Ms.

Lovett's body was stiff and "still in the form of rigor mortis" and that there was coagulated blood

on the back of her head.  (*Id.* at Tr. 439.)  There were no signs of forced entry to her apartment.

(*Id.* at Tr. 442, 449.)  Detective Newkirk noticed an empty suitcase on the floor with female

clothing "strewn all over the place."  (*Id.* at Tr. 441.)  The kitchen was extremely clean except for

two drinking glasses, which contained an orange liquid.  (*Id.*)  The drinking glasses were later

---

[19]  The coroner, Robert Challener, testified an autopsy was performed on Ms. Lovett on June
13, 1978.  (*Id.* at Tr. 410.)  When her body was discovered, she had been "dead for some
time and had begun to decompose."  (*Id.*)  Mr. Challener clarified Ms. Lovett had probably
been dead for 36 hours when her body was discovered, but later stated that death could have
occurred anywhere between 12 and 48 hours before her body was found. (*Id.* at Tr. 414-415.)
He testified the autopsy found Lovett had sustained blunt force trauma to the head and
multiple knife wounds.  (*Id.* at Tr. 411-413.)  She also had ligature marks on her neck and
a telephone cord was found wrapped around her neck twice.  (*Id.*)  Mr. Challener identified
cause of death as ligature strangulation and multiple stab wounds. (*Id.* at Tr. 423.).

dusted for prints.[20]  (*Id.* at Tr. 469.)  Detective Newkirk canvassed the area, but there were no

eyewitnesses.  (*Id*. at Tr. 451.)

Later that day, Detective Newkirk interviewed Fortson, who was present when Ms.

Lovett's body was discovered.  (*Id*. at Tr. 456-459.)  Fortson stated he had last seen Ms. Lovett on

May 31, 1978.  (*Id*. at 458.)  He denied being her pimp, and stated he used to date her but she had

broken it off four weeks previously.  (*Id*. at Tr. 458-460.)  Several weeks later, Detective Newkirk

spoke with Jacque Conners (aka Tina Hiemer).  (*Id*. at Tr. 463–465.)  Ms. Conners told him she

had been with Fortson "all night long" on the night of May 31 to June 1, 1978.  (*Id*. at 465.)

Newkirk stated the case eventually went "cold."  (*Id*. at Tr. 472.)

Ms. Conners testified that, in June 1978, she was eighteen years old and worked as a

prostitute in Cleveland.  (*Id*. at Tr. 645-647.)  Fortson was her pimp.  (*Id*.)  She stated that, at that

time, there were four women who worked as prostitutes for Fortson: Ms. Lovett (aka Little Bit),

Havannia Fails (aka Candy), Glenda Anderson (aka Chris), and herself.  (*Id*. at Tr. 647-648.)  Ms.

Conners testified Ms.  Lovett "worked the streets" around the Biscayne Lounge on Euclid Avenue

and had been with Fortson the longest.  (*Id*. at Tr. 652.)  She testified to several incidents where

Fortson beat up the women working for him, including one occasion where he assaulted Ms.

Conners severely enough to require emergency room care.  (*Id*. at Tr. 659-662.)  Ms. Conners

also testified fellow prostitute Glenda Anderson went missing sometime in July to August 1978

---

[20]Six prints were lifted from the drinking glasses.  (*Id.* at Tr. 469.)  Three of these prints were
immediately identified as belonging to Ms. Lovett.  (*Id*.)  The other prints were not matched
until years later, in 1998, when the Euclid Police Department obtained the Automated
Fingerprint Identification System ("AFIS").  (*Id*. at Tr. 770-771, 777-784.)  At that time, the
prints were matched to Robbie Robertson and Charles Tolliver, both of whom are related to
Fortson.  (*Id*. at Tr. 777-784; Doc. No. 42-3 at Tr. 895, 926.)

and had not been found, although her car was found "sliced and damaged."  (*Id*. at Tr. 693.)

Ms. Conners then testified that, on May 28, 1978, she told Fortson that Ms. Lovett was going to leave him and "had chosen a player [i.e., a pimp] in New York and had given her diamonds to him."  (*Id*. at Tr. 663.)  She stated Fortson "freaked out and became very angry." (*Id*. at Tr. 664.)  Several days later, on May 31, 1978, Ms. Conners received a package from Ms. Lovett which contained photographs of her (Ms. Lovett) and Fortson.  (*Id*. at Tr. 666.)  Ms. Conners gave the pictures to Fortson, in response to which he became "enraged" and said "I'm going to kill the bitch."  (*Id*. at Tr. 667.)  That evening, Ms. Conners and Fortson went to the Midtown Hotel, took a shower, and went to bed.  (*Id*. at Tr. 668.)

Contrary to her previous statement to Detective Newkirk in June 1978, Ms. Conners testified at trial that she woke up that night (i.e., the night of May 31 to June 1st) around 3 or 4 a.m. and Fortson was not there.  (*Id*. at Tr. 669.)  Ms. Conners fell back asleep and was awakened when Fortson returned at some point between 3:00 and 4:00 a.m. acting "abnormal."  (*Id*. at Tr. 669-670.)  He was irrational, nervous, and paranoid, and was pacing around and shaking.  (*Id*. at Tr. 670-671.)  According to Ms. Conners, Fortson kept saying "I got to find a witness."  (*Id*.)  Ms. Conners volunteered to be his witness, but stated she did not know why he needed a witness.  (*Id*. at Tr. 671-672.)  Conners testified Fortson left around 4:00 a.m., came back a few hours later, and was totally calm.  (*Id*. at Tr. 671-673.)

Ms. Conners learned on June 2, 1978 that Ms. Lovett had been murdered.  (*Id*. at Tr. 673.)  On that date, Fortson told Conners she needed to verify that he was with her (Conners) all night long.  (*Id*. at Tr. 675-676.)  Ms. Conners agreed to do so because she was "in fear of her life and her safety."  (*Id*. at 676.)  She told the police Fortson was with her the entire night.  (*Id*. at Tr.

676.)  Later that month, Ms. Conners told Fortson she was going to leave him.  (*Id*. at Tr. 677.)

She testified Fortson beat her up and threatened to kill her if she left.  (*Id*. at Tr. 678.)  In late June

1978, she and Fortson "got out of town" because Fortson heard the police were "on his tracks."

(*Id*.)  They went to Alexandria, Virginia and stayed there for about a month, during which Fortson

would not let Conners out of his sight.  (*Id*. at Tr. 679-680.)  Eventually, things "cooled down"

and they returned to Cleveland in September 1978.  (*Id*. at Tr. 681, 727-728.)

Shortly thereafter, Ms. Conners testified Fortson tried to kill her with a joint laced with

heroin.  (*Id*. at Tr. 682-683.)  She fled to Florida with a regular customer (Maurice Cleveland) and

did not return to Fortson or work as a prostitute again.  (*Id*. at Tr. 684.)  She testified she had lived

in Florida for the past twenty-two years, obtained her GED, and worked as a nurse.  (*Id*. at Tr.

685, 643-644.)  In 1986, she talked to her attorney and asked him to contact the Euclid Police

Department to "tell them that she had lied" about Fortson's alibi.  (*Id*. at Tr. 691.)  Conners met

with a Euclid police officer in Florida, who tape recorded their interview.[21]  (*Id*. at Tr. 692.)

During this interview, she recanted her alibi and told substantially the same story that she

ultimately testified to at trial.

Defense counsel vigorously cross-examined Ms. Conners.  Among other things, Ms.

Conners was questioned about Ms. Lovett's involvement with an individual named Archie Jones.

Ms. Conners testified Mr. Jones was Ms. Lovett's pimp "for a very minimal time."  (*Id*. at Tr.

728.)  When asked whether Mr. Jones ever beat Ms. Lovett, Conners stated only that "pimps beat

---

[21] On cross-examination, Ms. Conners testified she had recently reviewed a copy of the transcript of her May 1986 tape recorded interview with the Euclid Police.  (*Id*. at Tr. 699-670.)  The record reflects defense counsel was then given the opportunity to review the transcript and tape recording of that interview.  (*Id*. at Tr. 701-712.)  The transcript was also marked as an Exhibit and made part of the record.  (*Id*. at Tr. 710.)

you." (*Id*. at Tr. 729.) She later stated she had never seen Mr. Jones beat Ms. Lovett but admitted he was a "rough pimp." (*Id*. at Tr. 738-739.)

Ms. Lovett's mother (Damilian Hidalgo) and sister (Helen Lovett) also testified for the State. Ms. Hidalgo testified Ms. Lovett grew up in New York and went to Cleveland after she finished high school. (*Id*. at Tr. 552-554.) She stated Ms. Lovett visited her for two weeks in May 1978. (Id. at Tr. 555-557.) According to Ms. Hidalgo, Ms. Lovett "looked sad" and said she planned to move back home to New York. (*Id*.) On May 31, 1978, Ms. Lovett called her mother from Cleveland. (*Id*. at Tr. 558.) She stated she was scared for her life and, specifically, that she was scared of "Andy," i.e., Fortson. (*Id*. at Tr. 558-561.)

Ms. Lovett's sister, Helen, testified Ms. Lovett came home to New York two to three times per year and always had bruises on her arms, thighs, and back. (*Id*. at Tr. 575-576.) Like her mother, Helen testified Ms. Lovett visited New York in May 1978 and stayed for two weeks. (*Id.* at Tr. 579-580.) Ms. Lovett told Helen she was going to move back to New York permanently, to "change her life." (*Id*. at Tr. 580.) Helen stated Ms. Lovett confided in her that she was afraid of "Andy" and the "control he had over her." (*Id.* at Tr. 576-577, 579.) She stated Ms. Lovett was terrified of going back to Cleveland but insisted she had to go back to get her personal belongings. (*Id*. at Tr. 580-586.) Helen explained that, before leaving, Ms. Lovett was on the phone with Fortson for 30 to 40 minutes, crying. (*Id*. at Tr. 584-586.) After the call, Helen described Ms. Lovett as "hysterical." (*Id*.) Ms. Lovett told Helen that "Andy told me if I go back [to Cleveland], he will kill me." (*Id*. at Tr. 585.) Helen tried to convince Ms. Lovett not to go, but Ms. Lovett insisted that she return. (*Id*. at Tr. 585-586.) Ms. Lovett left New York on May 28, 1978. (*Id*.) Helen stated she spoke to her for the last time two days later, on May 30, 1978.

59

(*Id.*)  She described Ms. Lovett as "terrified."  (*Id*. at Tr. 587.)

> ### b.    *Alleged new and material evidence*

Fortson argues the evidence attached to his first and second delayed motions for new trial

impeach or, at the very least, call into question much of the above testimony.  He first asserts the

"newly discovered" evidence proves he was not Ms. Lovett's pimp at the time of her murder and,

further, that Ms. Lovett was not afraid of him.  Rather, he claims the new evidence shows that

Archie Jones was Ms. Lovett's pimp and had beaten her viciously in the weeks prior to her

murder.  Fortson relies on the following evidence for this argument.

In a Euclid Police Department Report dated June 2, 1978, Ms. Lynn/Coulter states Fortson

was Ms. Lovett's "ex-boyfriend."  (Doc. No. 9-5 at Exh. 87.)  She states Ms. Lovett had recently

had a fight with Archie Jones three weeks previously.  (*Id*.)  Ms. Lynn/Coulter explained as

follows:

> Q:    When did this happen and who is Archie?
>
> A:    I don't know the exact dates, approximately three weeks ago that Archie
>        jumped on Elaine.  She had been knowing Archie for about four days. She
>        liked him.  She was more or less infatuated with Archie.  She thought that
>        she would like to spend some time with him, become his girlfriend.  They
>        were together and they spent four days off and on together and she
>        decided that he wasn't the man that she thought he was and she told him
>        that she didn't want to be his girlfriend, that he had to leave her alone.
>        And he told her that she couldn't just walk in and out of his life like that, it
>        wasn't that easy, and he knocked her around.
>
> Q:    Where did this take place?
>
> A:    Right in front of the Biscayne.

(*Id*.)

Fortson also emphasizes a Euclid Police Department Report summarizing an interview

with Mr. Jones on December 14, 1983.  (Doc. No. 9-5 at Exh. 87.)  This report states as follows:

> This date I interviewed Archie Jones in connection with the June 1978 murder of Elaine Lovette [sic], aka Sonia Cruz.  Archie stated that he was familiar with the murder and added that he knew the victim very well. Stated that he stayed at the victim's apartment on Euclid Avenue on quite a few occasions and that just before she was killed she did work for him as a prostitute.  Archie stated that he did not kill, nor did he have any idea who did kill Elaine at the time. But added that he assumed that Andy Tolliver [aka Fortson] may have although he had nothing to base it on except for the fact that she and Andy were on and off; e.g., she would work for Andy and then give him a hard time and travel with some other people that she preferred.
>
> * * * Archie stated that he did have some words with the victim a few days before she was killed and added that he did slap her a few times when she was giving him some mouth in front of the Biscayne Lounge on Euclid Avenue. Also stated that he left the City with Sandra Mitchell around that same time traveling to Buffalo, New York where he worked with Sandy for a few weeks and then left her there.

(*Id.*)

He also relies on a Euclid Police Department Report summarizing an interview with Curtis Melton on June 19, 1978.  (Doc. No. 9-5 at Exh. 87.)  Therein, Mr. Melton stated he had been a pimp around the Biscayne Bar area for about five years.  (*Id.*)  He stated he knew Ms. Lovett but seldom talked to her.  (*Id.*)  He also explained as follows:

> Stated that he heard that Sonia [i.e. Ms. Lovett] was having trouble with a party by the name of Archie Jones, and after she had been killed, stated that he heard that Archie had gone 'schitzo' on her. Indicated that he had heard this from some of the girls, but did not know exactly whom.  Stated that he heard that Archie had spent some time with the victim and when she tried to cut him loose he (Archie) was very upset.

(*Id.*)

Finally, Fortson cites generally to a number of affidavits submitted in connection with his first delayed motion for new trial.  He notes Glenda Anderson (who, in fact, was not dead as suggested by Ms. Conners at trial) submitted an affidavit in June 2002 in which she stated that: "I

61

knew Elaine Lovett aka Little Bit for 2 years.  To my knowledge, Little Bit loved Andrew and had no intention on leaving Andrew.  If anything she was trying to get back with him."  (Doc. No. 9-2, Exh. 32.)  He also cites an affidavit of Havannia Wade[22] (aka Candy), in which she states that "at no time was Lovett scared of Fortson."  (*Id*.)  Ms. Wade further avers Ms. Lovett was not planning on leaving Fortson and, instead, "she came back from New York wanting to get back with him."  (*Id*.) Ms. Wade also states that "when I left the same lifestyle as Little Bit, Andrew Fortson wished me well and provided me with furniture, clothes and a car."  (*Id*.)

For the following reasons, the Court finds the above evidence is not sufficient to show that "it is more likely than not that no reasonable juror would have convicted" Fortson of Ms. Lovett's murder.  *See McQuiggen*, 133 S.Ct. at 1933; *Eberle*, 532 Fed. Appx. at 612.  While some of the above evidence potentially contradicts the State's theory that Fortson was Ms. Lovett's pimp and she was afraid of leaving him, the record reflects there was ample evidence to the contrary. Numerous witnesses testified Fortson was Ms. Lovett's pimp at the time of her murder, including Ms. Lynn/Coulter, Ms. Conners, and Helen Lovett.  (Doc. No. 42-2 at Tr. 363, 647-648, 575-575.)  The jury also heard a great deal of testimony regarding Fortson's temper, including that he frequently beat his prostitutes.  (*Id*. at Tr. 649, 659-662.)  Ms. Conners testified Fortson beat her up at least three times, and that she witnessed Fortson beat up Ms. Wade.  (*Id*. at Tr. 649, 660-662.)  Ms. Lynn/Coulter testified she witnessed Fortson beat up Ms. Lovett on one occasion, leaving her a "bloody mess."  (*Id*. at Tr. 365.)  Further, Helen Lovett testified that, when Ms. Lovett returned to New York to visit, she (Ms. Lovett) was bruised, fearful of Fortson, and

---

[22]  It appears that to the Court that "Havannia Wade" is the same individual referred to in some documents as "Havannia Fails."

terrified to return to Cleveland.  Helen Lovett also testified Ms. Lovett told her Fortson threatened to kill her.  (*Id*. at Tr. 585.)  Less than a week after returning to Cleveland, Ms. Lovett was dead. Given the above, the Court cannot say that it is more likely than not that no reasonable juror would have convicted Fortson.

With regard to the evidence regarding Archie Jones, as an initial matter, the Court is not convinced this evidence is "new."  The Sixth Circuit has recognized the circuits are split on whether the "new evidence" required under *Schlup* includes only newly-discovered evidence that was not available at trial, or encompasses any evidence not presented during trial.  *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012).  In *Bradshaw*, the Sixth Circuit noted that its decision in *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005) suggested "newly presented evidence" is sufficient, but declined to resolve the issue whether "the 'new' evidence required under *Schlup* includes only newly discovered evidence that was not available at the time of trial, or broadly encompasses all evidence that was not presented to the fact-finder during trial, i.e., newly presented evidence." *Bradshaw*, 693 F.3d at 633.  This Court likewise need not address the distinction, as even under the broader standard of "newly presented" evidence, the Court is not convinced the evidence relied on by Fortson with regard to Archie Jones is "new."

As set forth above, while the particular documents on which Fortson relies were not produced in discovery, the jury heard testimony from Ms. Conners that Mr. Jones was Ms. Lovett's pimp for a short time.  (*Id*. at Tr. 728.)  Although Ms. Conners stated she never personally saw Mr. Jones beat Ms. Lovett, she did acknowledge "pimps beat you" and Mr. Jones in particular was  "rough pimp."  (*Id*. at Tr. 729, 738-739.)  The Court further notes that, in the transcription of her interview with Euclid police in 1986 (which is attached as an exhibit to

Fortson's second motion for delayed trial), Ms. Conners states Mr. Jones was a "very low life type of person that always beat on his woman" and that both Ms. Wade and Fortson had told her Mr. Jones was Ms. Lovett's new pimp and "beats on her."  (Doc. No. 9-5 at Exh. 87, Page ID#s 1860-1861.)  The record reflects both the transcript and the actual tape recording of Ms. Conners' police interview were provided to defense counsel during trial, and the transcript was made part of the state court record.  (*Id.* at Tr. 701-712.)

Moreover, even assuming this evidence is considered "new" for actual innocence purposes, the Court finds it is not sufficient to show that no juror, acting reasonably, would have voted to find Fortson guilty beyond a reasonable doubt.  Numerous witnesses testified Fortson was Ms. Lovett's pimp and that he both beat her and threatened to kill her.  Moreover, Ms. Lovett's mother and sister each testified Ms. Lovett was terrified of Fortson and "scared for her life."  (Doc. No. 42-2 at Tr. 558-561, 576-577, 579, 580-587.)  This testimony, combined with the fact that the only fingerprints found in Ms. Lovett's apartment belonged to Fortson's brother and cousin, precludes the Court from finding that no reasonable juror would have voted to find Fortson guilty beyond a reasonable doubt had the Archie Jones evidence discussed above been presented at trial.  Accordingly, in light of the above, the Court finds the documents upon which Fortson now relies are simply insufficient to satisfy the high standard of proof necessary to demonstrate actual innocence.[23]

---

[23] In addition to arguing this evidence implicates Archie Jones, Fortson also asserts it impeaches Ms. Lynn/Coulter's trial testimony that it was Fortson (instead of Jones) that beat Ms.Lovett in front of the Biscayne Bar.  As an initial matter, it is entirely possible that Ms. Lovett was referring during her trial testimony to a separate incident when Fortson assaulted Ms. Lovett in front of the Biscaye Bar. Moreover, even assuming Ms. Lynn/Colter was mistaken at trial, the jury heard testimony from other witnesses indicating that Fortson assaulted the prostitutes that worked for him.

The Court reaches a similar conclusion with regard to Fortson's argument that the "new" evidence impeaches the State's evidence regarding the timeframe for Ms. Lovett's murder. Fortson relies principally on the withheld statements of Ronald Harris, Ann Coulter, Havannia Fails, and Sonia Foneca aka Sonia Atkinson in support of this argument.  Fortson articulated this argument in his second motion for delayed trial, as follows:

> Withheld statements from Ronald Harris, Ann Coulter, and Havannia Fails contradict the testimony of Jacque Conners, proving the victim was alive during the timeframe of 3 AM to 4 AM as follows: Sonia Foneca aka Sonia Atkinson stated she did not see Elaine leave the corner until 2 AM; police notes state Elaine was with Liz and Ronnie around 3 AM; Ronald Harris stated that he called Prospect Lounge around 1AM and talked to Elizabeth and she told him that her and Elaine would drive to his home.  He stated that they arrived around 3 AM, he made breakfast but Elaine didn't eat anything.  Harris further stated that they all left together around 3:30 AM and Elaine dropped them off at the Midtown Hotel where Elizabeth lives and that was the last time Harris saw Elaine.  Ann Coulter stated that she last saw Elaine at 4 AM; and Havannia Fails said she saw her last at 4 AM.  This exculpatory evidence was withheld from the defense and proves the victim's whereabouts until 4 AM.

(Doc. No. 9-5 at Exh. 87, p. 6.)  Fortson argues this evidence would have impeached the testimony of both Ms. Conners and Ms. Lynn/Coulter and, further, demonstrates he could not have committed the murder.

The Court disagrees.  As Respondent correctly notes, the State's theory was that Fortson had two "henchmen" (half-brother Robbie Robertson and cousin Charles Tolliver) carry out Ms. Lovett's murder.  This theory was supported by the testimony detailed above, as well as the fact that the only fingerprints found in Ms. Lovett's apartment other than her own were those of Mr. Robertson and Mr. Tolliver.  The fact that the "new" evidence (i.e., the withheld statements of Harris, Coulter, Fails, and Foneca/Atkinson) suggests Ms. Lovett was seen alive as late as 4:00 a.m. on June 2, 1978, does not directly affect the State's theory or lead to the inevitable outcome

65

that Fortson could not have orchestrated Mr. Lovett's murder. Thus, the Court finds Fortson's argument to the contrary to be without merit.

Accordingly, upon careful and thorough review, the Court finds the allegedly "new" evidence discussed above (regarding motive, Mr. Jones, and the timeline for Ms. Lovett's murder) fails to demonstrate that "it is more likely than not that no reasonable juror would have convicted" Fortson of Ms. Lovett's murder. *See McQuiggen*, 133 S.Ct. at 1933; *Eberle*, 532 Fed. Appx. at 612.

**2.    *Recantation Affidavits of Brenda Caver and Andee Caver***

Fortson also argues the recantation affidavits of Brenda and Andee Caver demonstrate he is actually innocent. Respondent asserts these affidavits are neither "new" nor "reliable" evidence of Fortson's innocence. Again, the Court first discusses the testimony and evidence introduced at trial, and then recounts the allegedly "new and reliable" evidence relied upon by Fortson herein.

**a.    *Testimony and evidence introduced at trial***

At trial, Brenda Caver testified she met Fortson in 1974 and had a daughter by him, Andee. (Doc. No. 42-3 at Tr. 851.) She stated that, in 1978, she was a prostitute and Fortson was a pimp. (*Id*. at Tr. 867.) Brenda testified she was under a subpoena to testify at Fortson's trial. On the day she received her subpoena, she spoke with Fortson, who said he did not feel it would be "detrimental" for her (Brenda) to testify but that Andee's testimony "would be his demise so to speak." (*Id* at Tr. 857-858.) According to Brenda, Fortson told her "it would be best if we were not seen" and offered to pay to send her and Andee to California. (*Id*. at Tr. 859.) She testified she and Andee became very frightened after receiving a telephone call from her son shortly

66

before trial.  (*Id*. at Tr. 852-855.)  Brenda stated she and Andee spent the previous night in jail because they failed to come to Court to testify as ordered.  (*Id*. at Tr. 852-855.)

Andee was frightened and extremely reluctant to testify.  She stated the "FBI came and picked me and my mother up yesterday and brought us to jail" because they were under a subpoena to testify but had "run from home."  (*Id*. at Tr. 901-902.)  Andee stated she had run from the trial because she was afraid for her life.  (*Id.* at Tr. 903.)  She explained she was afraid of the prosecutors and "the whole thing and what else is going to come about."  (*Id*. at Tr. 904.)  Andee stated "the person I'm afraid of is not in this courtroom."  (*Id*.)  Later, when she was asked about Charles Tolliver, Andee burst into tears and became extremely frightened.  (*Id*. at Tr. 925-928.)  When asked why she was afraid of Charles Tolliver, she stated "my brother told me and my mother be afraid."  (*Id*. at Tr. 927.)  Upon further questioning, Andee stated she was afraid her mother would be killed if they testified.  (*Id*. at Tr. 928.)  Andee identified Charles Tolliver as her father's cousin.  (*Id*. at Tr. 929.)

Andee then testified as follows.  In October 1991, she had a conversation with Detective Newkirk.  She told Detective Newkirk that Fortson had taken her for a drive one day in his Rolls Royce and said he "needed to teach [her] the A, B, C's of life."  (*Id*. at Tr. 913-914.)  Andee recalled that she had previously given a statement to the Euclid Police, but denied telling them Fortson had confessed to killing Ms Lovett.  Rather, she stated she had "understood [Fortson] to mean that he had hurt someone," and that God knew and would punish him.  (*Id*. at Tr. 915-916.)  Andee also stated, however, she would not have lied to the police when she gave her initial statement.  (*Id*. at Tr. 916-917.)

67

### b.      *Alleged new and reliable evidence*

In 2002, Brenda and Andee Caver submitted affidavits recanting their trial testimony.

(Doc. No. 9-2 at Exh. 31.)  Andee's uncle, Robert Caver, also submitted an affidavit, explaining

Brenda and Andee's decision to recant.  (*Id*.)  Robert averred that, when he was released from

prison in June 2002, Andee informed him "the prosecutors had scared her into testifying by

incarcerating her and intimidating her with her children."  (*Id*.)  Robert claimed Andee told him

"she was scared to come forward and tell anyone how the prosecutor told lies on her at the trial of

her father (Andrew Fortson)," and prosecutors "told her she would say what they wanted her to

say at trial because they had been trying to get her Father for the murder of Elaine Lovett for a

long time."  (*Id*.)  Robert stated he encouraged Andee and Brenda to come forward with the truth.

(*Id*.)

In Andee's affidavit (dated June 25, 2002), she stated she was "coerced to be a State's

witness against my father Andrew Fortson."  (*Id*.)  She claimed "the week before the trial I told

the assistant prosecutor personally I did not agree with the statements they wanted me to say" but

"the prosecutor told me that I was to agree with any question they ask me and that was the way it

was going to be."  (*Id*.)  Andee further averred as follows:

> 8.      All the statements the prosecutor said I stated were not true.  I did not tell
> Detective Newkirk or anyone these statements:
>
>> A.      I never said Andrew told me 'how he made people disappear.'
>> B.      He never told me "how he killed Little Bit."
>> C.      I never told Detective Newkirk or anyone else Andrew told me he
>> "hired guys to kill her."
>
> * * *
>
> 9.      I was scared about my children and of the prosecutor putting me in jail. I
> was coerced to commit perjury by the prosecutor.

68

(*Id*.)

Brenda averred she was "forced into becoming a State's witness" and "the prosecutors and police demanded that I commit perjury at Andrew Fortson's trial."  (*Id*.)  She claimed "when the police and prosecutors began to get rough with me and my daughter I thought it was best to go along with whatever the police and prosecutors wanted us to do."  (*Id*.)  Brenda stated "[b]asically, we were told what to say, we were too afraid to cross the police or prosecutors."  (*Id*.)  Brenda also noted she "was angry with Andrew Fortson over the fact that he had evicted me so I wasn't happy with him anyway."  (*Id*.)

The Court finds these affidavits are not "reliable" evidence of actual innocence. Recantation testimony, particularly when it is belatedly submitted, is considered "of little value" and "viewed with great suspicion."  *See Carter v. Mitchell*, 443 F.3d 517, 539 (6th Cir. 2006) (and cases cited therein).  *See also Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring)) (holding the petitioner had failed to demonstrate a credible claim of actual innocence "under the demanding *Schlup* standard" given that "recanting affidavits are always viewed with 'extreme suspicion'" and "new statements from witnesses years after the crime are inherently suspect" and "are to be viewed with a 'degree of skepticism' "); *Byrd v. Collins*, 209 F.3d 486, 508 n. 16 (6th Cir. 2000)("'Recanting affidavits and witnesses are viewed with extreme suspicion by the courts.'")(quoting *Spence v. Johnson*, 80 F.3d 989, 997 (5th Cir.1996)); *Gray v. Hudson*, 2008 WL 1995362, at *7 (N.D. Ohio May 5, 2008) (Boyko, J.)(stating "the inherent suspiciousness of the recanting affidavits [of prosecution witnesses] coupled with their late filing more than three years after conviction and the lack of explanation as to why they were filed so late" failed to demonstrate "new reliable evidence" of the petitioner's actual innocence);

69

*Cleveland v. Bradshaw*, 65 F. Supp.3d 499, 523 (N. D. Ohio 2014) ("[A] recantation must be looked upon with the utmost suspicion")(quoting *Ortega v. Duncan*, 333 F.3d 102, 107 (2nd Cir. 2003)).

Here, the Court finds the belated affidavits submitted by Brenda and Andee Caver are suspect and fall "far short of the sort of extraordinary showing—like exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—needed to establish [the petitioner's] actual innocence." *See Freeman v. Trombley*, 483 Fed. Appx. 51, 60 (6th Cir. 2012) (finding the credibility of the petitioner's ex-girlfriend and mother of his child was "suspect" and holding her alibi affidavit submitted years after the petitioner's trial was insufficient to establish a credible actual-innocence claim); *see also Milton v. Sec'y, Dep't of Corr.*, 347 Fed.Appx. 528, 531–32 (11th Cir.2009) (holding the "threshold showing of actual innocence" was not met by affidavits, found to be unreliable, and unsworn statements, found to be even less reliable, that were submitted by the petitioner's friends and family members several years after the petitioner's trial); *Kalak v. Berghuis*, 2015 WL 2169785, at *8 (E.D. Mich. May 8, 2015) ("Affidavits from family members that are created after trial are not sufficiently reliable evidence to support a finding of actual innocence."); *Keith v. Palmer*, 2015 WL 1530331, at *4–6 (E.D. Mich. Mar. 31, 2015) (holding the "demanding actual innocence standard" was not satisfied by affidavits with "significant credibility problems" to the extent that they were either not based on first-hand knowledge or belatedly submitted without any explanation given for the filing delays); *Harris v. Smith*, 2013 WL 3873168, at *5 (E.D. Mich. July 25, 2013) ("Long delayed statements are viewed with extreme suspicion.").

As the state courts noted, Brenda nor Andee's affidavits were completed nearly two years

after Fortson was convicted and sentenced.  Neither offers any explanation for the delay, other

than that Robert "encouraged" them to come forward after his release from prison.  The Sixth

Circuit has found such a lengthy delay renders recantation testimony suspect.  *See e.g., Lewis v.

Smith*, 100 Fed. Appx. 351, 355 (6th Cir. 2004) (district court properly rejected as suspicious a

witness' recanting affidavit made two years after trial).  Indeed, the state courts reached the same

conclusion in rejecting Fortson's first delayed motion for new trial:

> The affidavits of Andee and Brenda Caver do not state convincing reasons why
> they failed to recant their testimony for over two years after Fortson's conviction.
> Andee Caver's affidavit states no reason for the delay, while Brenda Caver's
> affidavit stated that she was coming forward because she retained a lawyer.
> Although Robert Caver's affidavit states that he was able to convince his sister
> and his niece that the prosecutors could not carry out their threats against them,
> neither woman's affidavit refers to him. Moreover, the judge reasonably could
> have found this justification unlikely [footnote omitted] and rejected it as failing
> to provide clear and convincing proof.

*See State v. Fortson*, 2003 WL 22312206 at * 2 (Ohio App. 8th Dist. Oct. 9, 2003).

Moreover, the credibility of Brenda and Andee's affidavits is questionable given the

extreme fear exhibited by both women at Fortson's trial.  As the state appellate court aptly noted:

"The circumstances of the Cavers' original testimony do not show that an allegation of

prosecutorial coercion would have had a great effect because the jury was already aware of their

reluctance to testify.  Moreover, even though their affidavits claim prosecutors coerced them into

testifying falsely, their new claims would have to be assessed in light of testimony that they were

reluctant to testify because they feared Fortson."  *Id.* at * 3.  Thus, the Court finds Brenda and

Andee's affidavits do not constitute "reliable" evidence of actual innocence.

Accordingly, viewing the new evidence (as discussed above) in the context of all of the

evidence, incriminating and exculpatory, the Court cannot conclude Fortson has carried his

burden of demonstrating that this is the rare, extraordinary case warranting the equitable exception to the AEDPA statute of limitations based on actual innocence.  For all the reasons set forth above, Fortson has simply not carried his burden of demonstrating "that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *McCray v. Vasbinder*, 499 F.3d 568, 571 (6th Cir. 2007).

**F.     Conclusion**

For all the reasons set forth above, it is recommended the instant petition be dismissed as time-barred.  Because the petition should be dismissed on this basis, the Court need not reach the parties' arguments regarding procedural default and the merits of the petition.

## V.  Motion for Evidentiary Hearing

Fortson requests an evidentiary hearing to allow him to present evidence establishing his actual innocence.  (Doc. No. 38.)  To this end, Fortson states he intends to call the following five witnesses: (1) Andee Caver, (2) Ronald Harris, (3) Havannia Fails, (4) Glenda Anderson, and (5) Michael Conley.[24]  Fortson argues these witnesses will impeach the State's evidence regarding Fortson's alleged motive for killing Ms. Lovett, as well as the timeline for her murder.  Fortson also states Andee's testimony is necessary because "his whole conviction is based solely upon testimonial evidence."  (*Id*. at 5.)

Respondent asserts that, to the extent he seeks to introduce testimony relating to habeas grounds that were adjudicated on the merits by the Ohio courts, Fortson's request should be denied pursuant to *Cullen v. Pinholster*, 563 U.S. 170 (2011).  She also argues Fortson is not

---

[24]  The only basis provided for calling Mr. Conley is that "he knew State's witness Jacque Conners well. He even drove her around.  Mr. Conley can testify to the reality of the relationship between Mrs. Conners and the petitioner Fortson."  (Doc. No. 38 at 10.)

entitled to an evidentiary hearing regarding his alleged actual innocence because he has failed to satisfy the requirements of § 2254(e)(2).

"[A] district court shall not hold an evidentiary hearing on a habeas claim unless the petitioner, who failed to develop the factual basis of the claim in state court, 'shows that the claim relies on a factual predicate that could not have been previously discovered through the exercise of due diligence.'" *Freeman v. Trombley*, 482 Fed. Appx. 51, 66 (6th Cir. 2012) (citing 28 U.S.C. § 2254(e)(2)(A)(ii)). "Diligence for purposes of § 2254(e)(2) depends on 'whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court.' " *Robinson v. Howes*, 663 F.3d 819, 824 (6th Cir. 2012) (quoting *McAdoo v. Elo*, 365 F.3d 487, 500 (6th Cir.2004)).

Here, Fortson presented the factual basis underlying his gateway actual innocence claim to the state courts as support for his first and second delayed motions for new trial.  With respect to both motions, the state trial court determined that no evidentiary hearing was warranted and denied relief on the record presented.  Thus, although Fortson has not sufficiently explained why he delayed filing his delayed motions for new trials until months after obtaining the evidence upon which they were based, the Court will assume he exercised due diligence in attempting to further develop the factual bases for his claim in the state courts.  *See Freeman*, 483 Fed Appx. at 66.

Assuming Fortson has been diligent, the Court must next consider whether he has shown that an evidentiary hearing is warranted.  In the context of gateway actual innocence claims, the Sixth Circuit instructs that federal courts "must consider whether an evidentiary hearing can realistically be expected to enable [petitioner] to prove his factual allegations, which, if true,

would entitle him to relief." *Ata v. Scutt*, 662 F.3d 736, 742 (6th Cir.2011) (citing *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). As the Supreme Court has noted, "[i]f district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts." *Schriro*, 550 U.S. at 475, 127 S.Ct. 1933. Thus, federal courts should "scrutinize the existing record with an eye toward determining how it might realistically be expanded to enable petitioner . . . to demonstrate his actual innocence." *Freeman*, 483 Fed. Appx. at 66.

The Court finds Fortson has failed to demonstrate an evidentiary hearing would realistically be expected to enable him to prove factual allegations, which, if true, would entitle him to relief. In light of the unreliability of Andee Caver's recantation affidavit (as discussed above), the Court is not convinced her testimony at an evidentiary hearing would demonstrate Fortson's actual innocence. Moreover, even if the Court were to assume the truthfulness of the assertions in Andee's affidavit, it would not inevitably lead to the conclusion "that it is more likely than not that no reasonable juror would have found [Fortson] guilty beyond a reasonable doubt." *McCray*, 499 F.3d at 571. As discussed at length *supra*, the State's case against Fortson was not built solely, or even primarily, on Andee Caver's testimony. Rather, the State also relied heavily on the testimony of Ms. Conners, who testified that Fortson (1) was Ms. Lovett's pimp; (2) had a history of violence against his prostitutes; (3) "freaked out" and became very angry when he learned Ms. Lovett was going to leave him; (4) and threatened to kill her two days before her body was found. The State also relied on Ms. Conners' testimony that she lied about Fortson's alibi and that he, in fact, left their hotel room for an undetermined amount of time on

the night of Ms. Lovett's murder.  The State also relied on the testimony of Ms. Lovett's mother and sister, who testified Ms. Lovett was terrified of Fortson and he had threatened to kill her.  Finally, the State relied on evidence establishing that the only fingerprints found in Ms. Lovett's apartment (other than her own) were those of Fortson's half brother Robbie Robertson and cousin Charles Tolliver.

Andee's testimony at an evidentiary hearing, even if found fully credible, would not effect the above evidence.  Nor would the testimony of the other witnesses identified by Fortson in his motion.  Fortson claims these witnesses would impeach the State's evidence regarding the timeline and motive for Ms. Lovett's murder.  However, for all the reasons discussed above, the Court finds any testimony these witnesses would offer would simply not lead the Court to the conclusion that no reasonable juror could have found Fortson guilty beyond a reasonable doubt.

Accordingly, it does not appear an evidentiary hearing, focused on the new evidence of Fortson's alleged factual innocence, would help him demonstrate his case is the rare and extraordinary one that meets the demanding gateway actual innocence standard.  In *Schriro*, the Supreme Court cautioned against unnecessarily disturbing the finality of state court judgments and conducting evidentiary hearings based on insubstantial factual allegations.  Fortson has failed to explain how an evidentiary hearing could realistically be expected to enhance the existing insufficient showing of his actual innocence.

Accordingly, the Court finds an evidentiary hearing is not warranted.  Fortson's Motion (Doc. No. 38) should, therefore, be denied.

### VI. Conclusion

For the following reasons, it is recommended that (1) Petitioner's Motion to Expand the

75

Record (Doc. No. 36) be GRANTED IN PART and DENIED IN PART; (2) Petitioner's Motion

for Evidentiary Hearing (Doc. No. 38) be DENIED; and (3) the Petition be DISMISSED as time-

barred.


Date:   November 21, 2016                         _s/ Jonathan Greenberg_____
                                                  Jonathan D. Greenberg
                                                  United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the
specified time may waive the right to appeal the District Court's order.  See _United States v.
Walters_, 638 F.2d 947 (6th Cir. 1981); _Thomas v. Arn_, 474 U.S. 140 (1985), _reh'g denied_, 474
U.S. 1111 (1986).**