UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW FORTSON, | ) | Case No.: 1:15 CV 2078 |
| | ) | |
| Petitioner | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| v. | ) | |
| | ) | |
| LASHAUNN EPPINGER, | ) | |
| | ) | |
| Respondent | ) | <u>ORDER</u> |

This case is before the court on the Report and Recommendation ("R & R") of Magistrate Judge Jonathan D. Greenberg ("Magistrate Judge" or "Judge Greenberg"). (R & R, ECF No. 43.) Judge Greenberg recommended that the court dismiss as time-barred Petitioner Andrew Fortson's ("Petitioner" or "Fortson") Petition under 28 U.S.C. § 2254 ("§ 2254 Petition") (ECF No. 1). He also recommended that Fortson's Motion to Expand Record (ECF No. 36) be granted in part and denied in part, while his Motion for Evidentiary Hearing (ECF No. 38) be denied. Fortson timely filed Objections (Objs., ECF No. 46) to Judge Greenberg's R & R. For the following reasons, the court overrules Fortson's Objections to the R & R, adopts Judge Greenberg's R & R, and dismisses Fortson's § 2254 Petition.

**I. BACKGROUND**

Judge Greenberg's R & R exhaustively detailed the complex factual and procedural background of this case, to which Fortson has raised no objection. The court, therefore, adopts the factual and procedural background articulated in the R & R and provides only a summary of the

relevant facts.

## A. Factual Summary

The Ohio Court of Appeals for the Eighth Appellate District summarized the facts underlying Fortson's conviction as follows:

> The victim, Elaine Lovett (aka Little Bit), a prostitute working for defendant, was killed more than twenty years ago on June 1, 1978. Two of defendant's relatives, Robbie Robertson (his half brother) and Charles Tolliver (his first cousin) were also allegedly involved. Police in Euclid (where the killing occurred), New York (where the victim and her family were from), and Florida (where another prostitute moved to escape defendant) put together parts of the case over a period of more than twenty years.
>
> There was little physical evidence at the scene to indicate who committed the homicide. Fingerprints were found on two glasses in the victim's kitchen but were not identified until 1999. The investigation went through several stages: in 1978 when the homicide occurred, in 1986 when an alibi witness recanted her testimony, in 1991 when defendant's daughter told the police defendant admitted to the killing, and finally in 1999 when the police linked the fingerprints to defendant's co-defendant Robertson and Charles Tolliver.
>
> On June 1, 1978, defendant and prostitute Jackie Lynn (aka Jackie Colter) reported finding the victim's body in her Euclid residence and were questioned by police. Lynn/Colter apparently did not know what happened. She was hysterical and police took no statement from her.
>
> Two weeks later, on June 16, 1978, defendant and prostitute Jacque Conners (aka Tina Heimer) were questioned. Conners/Heimer provided defendant with an alibi for the time of the killing. Approximately eight years later, on May 3, 1986, after she had fled to Florida to escape defendant, however, she talked to Euclid police and recanted the alibi. The witness stated she told defendant on May 28, 1978 that the victim was going back to New York, would prostitute for someone else, and had given her new pimp some diamonds that defendant had given her. Defendant told the witness "I'm going to kill the bitch." On the evening of the murder, Conners/Heimer fell asleep with defendant, and awoke between 3:00 and 4:00 a.m. when he was gone. When defendant returned after 4:00 a.m., he was nervous, pacing and looking for a "witness." She agreed to provide him an alibi. When defendant tried to kill her with heroin in September of 1978, she fled to Florida.
>
> Brenda Caver, another prostitute (and defendant's common law wife) had a daughter with defendant by the name of Andee Caver. Both Brenda and Andee testified that defendant was a pimp, that they were afraid to testify, and that he urged them to go

-2-

> to California rather than testify. The court called defendant's daughter as its own witness and each party cross-examined her. Her testimony at trial was guarded and vague. She admitted that she told Euclid police in 1991 that defendant confessed to killing the victim known as Little Bit.
>
> The victim's mother and sister testified that the victim was in New York shortly before she was killed. The victim told her mother, Damilian Hildago, that she was afraid of "Andy" (defendant Andrew Fortson/Tolliver). The victim told her sister, Helen Lovett, that she was going back to Cleveland to get her possessions despite the fact that "Andy told me if I go back, he will kill me."
>
> The victim was strangled by her telephone cord and stabbed sixteen times in the apartment defendant rented for her shortly after she returned to Cleveland. Her furniture was also repeatedly slashed. There were no signs of forced entry.
>
> After identifying his fingerprints on one of the glasses from the victim's apartment, Euclid and New York City police detectives interviewed co-defendant Robbie Robertson in 1999. NYPD Detective Neglia and Euclid Detective Jorz testified that Robertson told each of them the same story. When asked whether defendant was the killer, Robertson answered "you're barking up the wrong tree. You have to question the guy who drove me there." Jorz testified that the fingerprints on the drinking glasses found in the victim's apartment belonged to Robertson and Tolliver, defendant's relatives.
>
> The matter proceeded to a joint trial against defendant and co-defendant Robertson on charges of aggravated murder and conspiracy to commit aggravated murder. [footnote omitted]. The jury found defendant guilty of aggravated murder and acquitted Robertson. Defendant appeals, raising eleven assignments of error.

*State v. Fortson*, 2001 WL 898428 at * 1-2 (Ohio App. 8th Dist. Aug. 2, 2001).

### B. Procedural History

On December 16, 1999, a Cuyahoga County, Ohio Grand Jury indicted Fortson, along with co-defendant Robbie Robertson ("Robertson"), on charges arising from the 1978 murder of Elaine Lovett. Specifically, Fortson was charged with one count of aggravated murder, in violation of Ohio Revised Code § 2903.01 (Count One) and one count of conspiracy to commit aggravated murder, in violation of Ohio Revised Code §§ 2923.01, 2903.01 (Count Two). This indictment was assigned case number CR 385443. Robertson was also charged with one count of conspiracy to commit

aggravated murder in case number CR 385443, and one count of aggravated murder, in case number CR 371155. Fortson entered a plea of not guilty to the indictment. On April 11, 2000, the State re-indicted Fortson and Robertson on the charges of conspiracy to commit aggravated murder, this time specifying the overt acts allegedly committed in furtherance of the conspiracy. This indictment was assigned case number CR 389991. Fortson entered a plea of not guilty to this indictment. The court also granted the State's request to nolle prosequi the conspiracy charges in case number CR 385443.

On May 12, 2000, a jury in the Cuyahoga Court of Common Pleas found Fortson guilty of aggravated murder, as charged in case number CR 385443. However, Fortson was acquitted of conspiracy to commit aggravated murder, as charged in case number CR 389991. Robertson was acquitted of all charges. On June 6, 2000, Fortson was sentenced to a term of life in prison with parole eligibility after twenty years. Petitioner timely filed a direct appeal, on July 5, 2000, with the Court of Appeals for the Eighth Appellate District. Petitioner's conviction and sentence were affirmed on August 2, 2001. Fortson next pursued his appeal with the Supreme Court of Ohio, which on December 5, 2001, declined jurisdiction and dismissed the case. Petitioner did not seek a writ of certiorari from the United States Supreme Court.

While his appeal was pending before the Supreme Court of Ohio, Fortson filed, on November 27, 2001, an Application to Reopen Appeal pursuant to Rule 26(B) of the Ohio Rules of Appellate Procedure. The Court of Appeals for the Eighth Appellate District denied the application, on December 11, 2001, as untimely and meritless. Petitioner did not appeal this ruling to the Supreme Court of Ohio. Instead, he filed a "Motion for Delayed Reconsideration to Reopen," which the Court of Appeals denied on February 6, 2002. Fortson did not seek further review in the Supreme Court of Ohio.

Fortson then filed, on August 9, 2002, a Petition for Writ of Habeas Corpus in this court.

After the petition was fully briefed, Fortson filed a "Motion to Withdraw Writ of Habeas Corpus, Without Prejudice, in Order to Exhaust State Claims." The court granted the motion on April 21, 2003, and dismissed the petition. However, before the federal habeas petition had been dismissed, Fortson filed, on November 4, 2002, his first delayed motion for a new trial in the Cuyahoga Court of Common Pleas. The court denied the motion, on February 6, 2003, as untimely and meritless. Fortson appealed, but the state appellate court affirmed the lower court decision on October 9, 2003.

Thereafter, Fortson made numerous attempts, over the course of approximately eleven years, to collaterally attack his conviction and sentence. Specifically, Fortson filed: (1) five state habeas petitions between October 2003 and September 2005; (2) two post-conviction petitions on December 2, 2003 and December, 31, 2007; and (3) a second delayed motion for a new trial. All of these motions were ultimately dismissed by the state appellate courts, concluding with Fortson's delayed motion for a new trial, on December 24, 2014.

On September 29, 2015, Fortson filed the instant § 2254 Petition, setting forth seven grounds for relief. Fortson was later granted leave to amend his Petition to add an eighth claim. Despite the fact that his § 2254 Petition had been filed some fifteen years after his conviction became final, Fortson asserted that his claims are not barred by the statute of limitations of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(d)(1). First, he argued that the fifth and sixth grounds are timely under § 2244(d)(1)(D), AEDPA's factual-predicate provision. Second, he contended that he made a credible showing of actual innocence by virtue of allegedly "new" evidence in the form of statements from several witnesses.

Respondent LaShaunn Eppinger ("Respondent") moved to dismiss the § 2254 Petition as time-barred. However the motion to dismiss was denied, and Respondent was directed to file a return of writ fully briefing the merits, as well as statue of limitations arguments. Respondent filed

a Return of Writ on May 23, 2016. Petitioner thereafter filed a motion to expand the record by an additional eleven exhibits, primarily made up of Euclid, Ohio Police Department reports regarding the original murder investigation and witness interviews. On August 25, 2016, Fortson filed his Traverse, raising both § 2244(d)(1)(B) and the doctrine of equitable tolling as additional grounds to excuse his late-filed petition. According to Petitioner, he was prevented from filing his petition earlier because the State allegedly withheld, until "late 2012," statements and notes from the initial 1978 police investigation that provided the factual predicate for some of his claims. Petitioner also moved for an evidentiary hearing, at which he planned to call five witnesses who he argued would impeach the State's evidence regarding the motive and timeline for the murder. Respondent opposed the request for an evidentiary hearing.

On November 21, 2016, Judge Greenberg issued his R & R, granting in part and denying in part Petitioner's Motion to Expand Record, denying the Motion for Evidentiary Hearing, and dismissing the § 2254 Petition as time-barred. The Magistrate Judge first recommended expanding the record by including Exhibits 1, 3, 4, 5, 6, 7, 8, 9, 10, and 11, finding that these exhibits may be relevant to Fortson's actual innocence argument and had not yet been included in the record. Next, the Magistrate Judge concluded that, even giving Fortson every benefit of the doubt, the § 2254 Petition is time-barred. Judge Greenberg recommended finding that Petitioner had filed the petition well-beyond the one–year statute of limitations imposed by any of the three claimed subsections of 28 U.S.C. § 2244(d), and that Petitioner had failed to demonstrate either equitable tolling or actual innocence to permit the court to review the merits of the untimely petition. The Magistrate Judge concluded by denying Fortson's request for an evidentiary hearing.

Petitioner timely filed his Objections to the R & R on January 23, 2017, challenging Judge Greenberg's findings regarding actual innocence and the request for an evidentiary hearing.

## II. LAW AND ANALYSIS

The Federal Magistrates Act requires a district court to conduct a de novo review only of those portions of a report and recommendation to which specific objections have been made. 28 U.S.C. § 636(b)(1). After review, a district judge "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). Accordingly, this court will review the portions of the R & R to which Petitioner has raised his Objections.

### A. Actual Innocence

The United States Supreme Court has held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass" a statute of limitations bar to review. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). The Court has cautioned, however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Schlup v. Delo*, 513 U.S. 298, 321 (1995) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); *see also Souler v. Jones*, 395 F.3d 577, 600 (6th Cir. 2005). To establish actual innocence, a petitioner must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in light of new evidence. *Schlup*, 513 U.S. at 327.

To that end, a petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324; *see also Connolly v. Howes*, 304 F. App'x 412, 417 (6th Cir. 2008). In determining whether the petitioner's burden has been met, the court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). The court "may consider how the timing

of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 332; *see also Eberle v. Warden, Mansfield Corr. Inst.*, 532 F. App'x 605, 612–13 (6th Cir. 2013). It is not the court's task to "work through an 'independent factual determination' to divine 'what likely occurred'"; rather the court must "assess the likely impact of the evidence on reasonable jurors[.]" *Eberle*, 532 F. App'x at 612–13 (quoting *House*, 547 U.S. at 538).

In his R & R, Judge Greenberg applied the *Schlup* standard to determine that Fortson failed to present any "new" evidence that could establish a credible claim of actual innocence. (*See* R & R 50–72.) Petitioner objects to this portion of Judge Greenberg's R & R, arguing that the Magistrate Judge failed to properly consider the "net effect" that his purportedly new evidence would have on a reasonable juror. (Objs. 19.) Fortson also largely reiterates the contentions advanced in many of his state court filings to contend that he has demonstrated actual innocence. (*See* Objs. 18–21, 24–52.) He insists that the police investigatory notes and witness statements from 1978, which were allegedly withheld by the State and not obtained by Fortson until late 2012, contradict the testimony of the State's primary witnesses—Jacque Conners ("Conners") and Jackie Lynn ("Lynn"), two prostitutes who worked for Fortson—regarding the alleged timeline and motive for Ms. Lovett's murder, and demonstrate that another individual, Archie Jones, committed the crime. Finally, Fortson asserts that the recantation affidavits of Andee Caver and Brenda Caver, who testified at his trial, demonstrate his innocence.

After conducting a de novo review, the court remains unpersuaded by Fortson's contentions, because he has not presented the type of reliable exculpatory evidence contemplated in *Schlup*. He has not presented "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" that supports his claim of actual innocence. *House*, 547 U.S. at 537. Rather,

Fortson's proffered evidence mostly consists of reports and affidavits that purport to show inconsistencies in witnesses' testimony. At trial, Conners testified that Fortson was also the victim's pimp, and that he had a history of violently assaulting his prostitutes. (Trial Tr. vol. 2, 647:24–648:19, 659:1–662:10, ECF No. 42-2.) She also averred that Fortson became very angry when he learned Ms. Lovett was going to leave him for a pimp in New York and threatened to kill the victim two days before her body was found. (*Id.* at 663:14–664:8, 665:23:–667:15.) Lynn testified that she had seen Fortson beat Ms. Lovett up on at least one occasion, leaving her "a bloody mess."(*Id.* at 364:22–365:20, 382:6–25.)

Fortson asserts that the newly proffered evidence directly contradicts this testimony. In one police report, dated June 2, 1978, Lynn described Fortson as the victim's "ex-boyfriend." (ECF No. 9-5, at 174.) She also explained that, approximately three weeks prior to the murder, Archie Jones had beaten Ms. Lovett. (*Id.* at 175–76.) Archie Jones, in an interview summarized in a 1983 police report, admitted to knowing "the victim very well" and to "slap[ping] her a few times" a few days before the murder. (*Id.* at 186.) Fortson also points to affidavits from Glenda Anderson and Havannia Wade who aver, in relevant part, that Ms. Lovett was not afraid of Fortson or planning to leave him. (ECF No. 9-2, at 137–138.)

However, this evidence is largely cumulative of the version of events presented by Fortson at trial, which the jury plainly rejected. The jurors heard testimony from Ms. Conners that Archie Jones had been Ms. Lovett's pimp for a short time and that he was known for being particularly rough. (Trial Tr. vol. 2, 728:22–25; 738:24–739:2.) Conners's taped statement to police, in which she described Archie Jones's reputation for violence, was provided to defense counsel during the trial. (*Id.* at 701:2–711:20.)

Further, the statements of Glenda Anderson and Havannia Wade are of questionable

-9-

reliability because they were submitted over a year after Fortson's trial. *See, e.g.*, *Freeman v. Trombley*, 483 F. App'x 51, 60 (6th Cir. 2012) (finding that alibi affidavit submitted years after the petitioner's trial was insufficient to establish a credible actual-innocence claim). The affidavits are also questionable because Anderson and Wade worked as prostitutes for Fortson. *See Milton v. Sec'y, Dep't of Corr.*, 347 F. App'x 528, 531–32 (11th Cir. 2009) (finding that affidavits from fellow inmates and family members created after trial are not sufficiently reliable evidence to support a claim of actual innocence). More importantly, their statements are contradicted by several witnesses, including Ms. Lovett's mother and sister, who testified at trial that the victim was, in fact, terrified of Fortson because he beat and threatened to kill her. (*See, e.g.*, Trial Tr. vol. 2, 558:5–562:2, 575:19–577:15, 579:4–7, 583:24–585:17.) Thus, it is unlikely that reasonable jurors would find Fortson's proffered evidence, regarding the motive for the murder, particularly credible or compelling.

The strongest evidence that Petitioner has proffered in support of his actual innocence claim is the allegedly withheld statements of Lynn (ECF No. 9-5, at 173), Ronald Harris (*id.* at 188), and Havannia Wade (ECF No. 36-1, at 12), which he argues refute the State's timeline for the murder. Because the statements establish that the victim was alive until approximately four o'clock in the morning, Fortson asserts that he could not have committed the murder. (ECF No. 9-5, at 162–63.)

At trial, the State had relied on Conners's testimony to establish that Fortson lacked an alibi for the night of the murder. Conners had originally provided Fortson with an alibi, but fled to Florida after he tried to kill her. (Trial Tr. vol. 2, 675:16–687:5, 691:19–692:2.) She recanted her original statement in 1986 and testified against Fortson. (*Id.*) Specifically, Conners testified that she woke up around three or four o'clock on the morning of June 1, 1978, and Fortson was not there. (*Id.* at 669:3–15.) She began to fall asleep again, only to be awakened when Fortson returned at some point

between three and four o'clock. (*Id.* at 669:17–25.) She later clarified that it was closer to four o'clock. (*Id.* at 671:6–12.) She described Fortson as appearing nervous, paranoid, and very upset; he was pacing around and shaking. (*Id.* at 670:4–7, 670:25–671:5.) He also repeatedly stated, "I got to find a witness." (*Id.*) Conners noticed that Fortson was not wearing the same clothing he had on before going to bed. (*Id.* at 670:11–22.) According to Conners, Fortson eventually left the hotel room again "to go find a witness." (*Id.* at 672:14–17.) He returned about one and a half to two hours later, and was totally calm. (*Id.*)

The court finds the statements proffered by Fortson to be unconvincing. Of these statements, only Lynn's comes close to supporting the argument advanced by Fortson, and its import is ambiguous at best. According to the police report summarizing her statement, when asked why she had gone to the victim's apartment on Friday, June 2, 1978, Lynn stated, "I was worried. Last I saw her was Thursday 4 a.m." (ECF No. 9-5, at 173.) Lynn also testified at trial; she stated that she became concerned on June 2, 1978, because she had not seen or heard from Ms. Lovett "in a couple of days." (Trial Tr. vol. 2, 367:25.) Thus, Lynn's statement does not necessarily contradict Conners's testimony or demonstrate that Fortson could not have committed the murder around four o'clock on June 1, 1978. Moreover, Fortson's defense counsel vigorously cross-examined Conners as to possible inconsistencies in her testimony. (*Id.* at 713:15–715:3, 757:18–759:20.) The jury nevertheless convicted Fortson.

Finally, the court considers the belated affidavits submitted by Andee Caver, Petitioner's daughter, and Brenda Caver, Petitioner's ex-girlfriend and Andee's mother. The affidavit of Andee Caver indicates, in relevant part, that she was "coerced" into perjuring herself at Fortson's trial because she was afraid of the prosecutor. (ECF No. 9-2, at 82.) She also avers that she had never told police that Fortson admitted to killing Ms. Lovett. (*Id.*) She provides no reason for her delay in

-11-

coming forward. Brenda Caver similarly avers that she was forced to perjure herself at Andrew Fortson's trial. (*Id.* at 84.) She was afraid of going to jail, was angry with Fortson, and thought it best to comply "when the police and prosecutors began to get rough with [her] and [her] daughter . . . ." (*Id.*) She avers that she came forward and provided the affidavit because she retained a lawyer. (*Id.*) Robert Caver, Brenda's brother and Andee's uncle, also submitted an affidavit. (*Id.* at 80.) He avers, in relevant part, that he "convinced" the women to change their trial testimony upon his release from prison in 2002. (*Id.*)

As Judge Greenberg correctly explained, such recantation testimony, particularly when it is belatedly submitted, is typically considered suspect and accorded little weight. *See, e.g.*, *Carter v. Mitchell*, 443 F.3d 517, 539 (6th Cir. 2006) (collecting cases); *Gray v. Hudson*, 1:06–cv–1308, 2008 WL 1995362, at *7 (N.D. Ohio May 5, 2008) (finding "the inherent suspiciousness of the recanting affidavits [of prosecution witnesses] coupled with their late filing more than three years after conviction and the lack of explanation as to why they were filed so late" failed to demonstrate "new reliable evidence" of the petitioner's actual innocence). The affidavits here—from Fortson's daughter and former girlfriend submitted almost two years after trial without any convincing reason for the delay—are no different.

Moreover, the jury was well aware that both women were extremely reluctant to testify. The record reveals that Andee Caver was afraid to testify because she had received death threats, and that she had been taken into custody by the FBI to ensure that she appeared. (Trial Tr. vol. 3, 901:10–904:14, 908:17–909:4.) Fortson's daughter also explained that she was afraid of the prosecutors. (*Id*. at 903:21–904:1.) Brenda Caver confirmed that she and her daughter had spent the night before trial in jail because they failed to appear in court to testify, and that they had received threats. (*Id*. at 852:4–854:23.) And, Andee Caver's testimony was far from unequivocal. Andee

recalled that she had previously given a statement to the Euclid Police in 1991, but denied telling them Fortson had confessed to killing Ms. Lovett. (*Id*. at 913:17–916:16.) She only conceded that she would not have lied to the police when she gave her initial statement. (*Id*. at 916:16–917:15.) Consequently, these "recantation" affidavits are unlikely to have a significant impact on the jury if they were now to be offered into evidence.

Thus, considering the evidence proffered by Fortson, in the context of all the evidence, the court concludes that Fortson has not carried his burden of demonstrating actual innocence. Even absent Andee Caver's testimony, the record is more than sufficient to support his conviction—Fortson was Ms. Lovett's pimp; had a history of violence against his prostitutes; became very angry with, and threatened to kill, Ms. Lovett two days before her body was found; appeared distressed and paranoid the night of the murder; and had Conners lie about his whereabouts because he had no alibi. The fact that the only fingerprints found in Ms. Lovett's apartment, other than her own, were those of Fortson's half brother Robbie Robertson and cousin Charles Tolliver, also supports the inference that Petitioner, rather than Archie Jones, was involved in the murder.[1] While Petitioner's efforts to contradict some of the testimony adduced at trial may marginally undermine the State's theory of the murder, this evidence does not persuade the court that no juror, acting reasonably, would have voted to convict Fortson beyond a reasonable doubt. *Cf. Schlup*, 513

---

[1] In his Objections, Fortson argues that the court cannot consider this evidence because the jury rejected the State's theory that he ordered Robertson and Tolliver to murder the victim, as evidenced by his acquittal on the conspiracy charge. (Objs. 53–62, 17–18.) Fortson also contends that this evidence should not have even been considered at trial, because the statute of limitations had previously run on the conspiracy charge. (*Id.* at 54.) However, Fortson and Robertson were also charged with aiding and abetting each other in the commission of aggravated murder. (Trial Tr. Vol. 3, 1084:–1085:18.) This evidence is certainly relevant to that theory of liability.

U.S. at 329.

## B. Evidentiary Hearing

Petitioner also objects to Judge Greenberg's denial of his request for an evidentiary hearing. Fortson argues, as he did in his Motion for an Evidentiary Hearing and his Traverse, that he is entitled to an evidentiary hearing to fully develop his actual innocence claim. (Objs. 65–69.) Petitioner also contends that Judge Greenberg applied the incorrect standard in evaluating his request. (Objs. 21–23.) He asserts the Magistrate Judge improperly assessed the reliability of the proffered evidence of actual innocence and that the only proper way to assess that evidence is by holding an evidentiary hearing. (*Id.*)

Petitioner's Objections are not well taken. Upon careful de novo review, the court finds that Petitioner has failed to demonstrate how an evidentiary hearing might realistically enhance his insufficient showing of his actual innocence. *See Freeman v. Trombley*, 483 F. App'x 51, 66 (6th Cir. 2012). Accordingly, the court finds that an evidentiary hearing is not required in this case.

## III. CONCLUSION

For the foregoing reasons, the court adopts Judge Greenberg's R & R (ECF No. 43) for the reasons stated therein, as well as those explained herein, and hereby dismisses Fortson's Petition under 28 U.S.C. § 2254 (ECF No. 1). The court also grants in part and denies in part Fortson's Motion to Expand Record (ECF No. 36) and denies his Motion for Evidentiary Hearing (ECF No. 38). The court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith, and that there is no basis on which to issue a certificate of appealability. Fed. R. App. P. 22(b); 28 U.S.C. § 2253(c) (2014).

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*
CHIEF JUDGE
UNITED STATES DISTRICT COURT

February 15, 2017